THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. RICHARD LARRY HUNT, DEFENDANT-APPELLANT.

Argued November 18, 25, 1957—Decided January 20, 1958.

516

*Mr. Joseph H. Edgar* argued the cause for the appellant.

*Mr. William D. Danberry,* Assistant Prosecutor, argued the cause for the respondent (*Mr. Warren W. Wilentz,* Middlesex County Prosecutor).

The opinion of the court was delivered by

JACOBS, J. The defendant, Richard Larry Hunt, was convicted of murder in the first degree and was sentenced to death. He appeals to this court as of right. *R. R.* 1:2–1(*c*).

The deceased, Helen Elizabeth Hunt, wife of the defendant, was shot to death in New Brunswick on June 20, 1956. The State alleges that the defendant murdered her and that the murder was willful, deliberate and premeditated. Its evidence, furnished by eyewitnesses and others, was to the following effect: The defendant married Helen in 1950 while he was in the Army. They lived at the Baltimore home of Helen's father until the defendant was sent overseas. Helen then lived with her sisters in New Brunswick, but when the defendant returned he and his wife again lived in Baltimore. They quarreled frequently and Helen was threatened often and was occasionally beaten by the defendant. In March 1956 the defendant threatened to cut Helen with a knife and her father asked him to leave. He left while Helen and their three children (Patricia, Rodney, and Ivy) remained at her father's home. On June 3, 1956 the defendant told Helen that he had a gun and was going to kill her. Her father, who had listened to their conversation, immediately called Helen's sister Bertha, who then took Helen and the children to her home in New Brunswick. On June 19, 1956 the defendant came to New Brunswick and on the following day he met his wife Helen, Thomas Williams, husband of Helen's sister Hannah, and Bertha as they were about to enter Bertha's home. Bertha saw the defendant carrying a gun in his hand; he told her to move out of the way and that he was going to kill Helen. Bertha's husband William Harley had come to the door and had told the defendant not to shoot, but the defendant repeated that he was going to kill Helen. William Harley, followed by Helen with her infant daughter Ivy in her arms, started running across the street but the defendant fired, striking Helen several times. One of his shots proved fatal. After the shooting the defendant was hit two or

three times with a baseball bat by Thomas Williams. The defendant, though injured, fled and was later apprehended in California and was returned to New Jersey for trial.

The defendant admits that he was near Bertha's home on June 20 and that he was carrying a gun. His story was that he left Baltimore for New Brunswick on June 19 intending to talk to his wife and to ask her to return with him and their children to Baltimore. On June 20 he saw Helen and the others in front of Bertha's home and he asked Helen whether he could talk to her. At that point Bertha told him to get away or she would call the police. He tried to talk to Helen but Bertha kept screaming "Get away from here." In response to an inquiry as to what then happened, he testified: "I don't know whether it was spots come across my eyes or whether I was hit, I don't know what happened. But during the scuffle Bertha pushed me back and I tried to get around Bertha because I never would push Bertha I would always try to get around her, and now I know that I was hit on the head with a baseball bat." He further testified that as he was lying on the ground he could feel something hitting him on the arm but "couldn't make out just what it was"; that he managed to get up but "the licks wouldn't stop"; and that "after the licks wouldn't stop that I felt, I got up and when I got up I reached in my pocket and I squeezed the trigger, then it didn't fire so I pulled it back and it still didn't fire so I put it back again and when I did I can't be sure whether I heard somebody say he got a gun or not, but anyway I just saw people leaving me and the picture I pictured was in the middle of the street and I started firing." The defendant did not remember what he did after that but denied that he ever threatened or intended to kill his wife. His present position is that he intended only to talk to his wife; that Bertha and the other relatives prevented him from doing so; that he was struck several times by the baseball bat; and that thereafter he fired wildly but does not know what actually happened. On appeal, his counsel does not question the legal sufficiency of the State's proof

that he committed willful, deliberate and premeditated murder, but he does assert that there were serious legal errors during the proceedings below which deprived the defendant of a fair and lawful trial. If there were such errors the defendant is admittedly entitled to a new trial regardless of the force of the testimony against him. See *State v. Orecchio*, 16 *N. J.* 125, 129 (1954); *State v. Wynn*, 21 *N. J.* 264, 271 (1956). *Cf. Meszaros v. Gransamer*, 23 *N. J.* 179, 188 (1957).

 The May 1956 term of the Middlesex County grand jury returned Indictment No. 301–56 in the matter of *The State of New Jersey v. Richard Larry Hunt*. It charged that Helen Elizabeth Hunt had been murdered but omitted the name of the defendant in the charging part though it was set forth in the caption. The defendant pleaded not guilty and moved to dismiss the indictment because of the omission. See 27 *Am. Jur., Indictments and Informations*, § 79 (1940); 42 *C. J. S. Indictments and Informations* § 127 (1944). The trial court refused to dismiss the indictment but postponed the trial, and thereafter Indictment No. 301A–56 was returned by the September 1956 term of the Middlesex County grand jury. This indictment specifically charged that "Richard Larry Hunt, willfully, feloniously and of his malice aforethought, did kill and murder one Helen Elizabeth Hunt, contrary to the provisions of *N. J. S.* 2A:113–1 and *N. J. S.* 2A:113–2." A motion to dismiss this second indictment was denied. The defendant now urges that the trial court erred in failing to dismiss the first Indictment No. 301–56. Assuming that to be so it is immaterial here, for the defendant was never tried under that indictment but was tried only under Indictment No. 301A–56. We find no merit in the defendant's contention that the failure to dismiss the first indictment "constituted double jeopardy" and "vexatious, cruel and inhuman treatment." The defendant was not in jeopardy under the first indictment (see *State v. Locklear*, 16 *N. J.* 232, 235 (1954)) and its pendency did not prejudice his defense to the second indictment or any of his constitutional rights. See *State v.*

*Faulks,* 97 *N. J. L.* 408 (*Sup. Ct.* 1922), where the defendant was tried and convicted under an indictment while a prior indictment for the same offense was pending. The former Supreme Court, in an opinion by Justice Parker, joined by Chief Justice Gummere and Justice Kalisch, found no difficulty in sustaining the conviction.

■ The defendant contends that Indictment No. 301A–56 was invalid because the members of the grand jury which returned it were advised by the county prosecutor of the earlier indictment by the previous grand jury. He does not suggest that the second grand jury was illegally constituted or biased (see *Pierre v. State of Louisiana,* 306 *U. S.* 354, 59 *S. Ct.* 536, 83 *L. Ed.* 757 (1939); *State v. Borg,* 9 *N. J. Misc.* 59 (*Sup. Ct.* 1931)), and we are not here concerned with the detailed nature of the showing before it. See *State v. Donovan,* 129 *N. J. L.* 478, 483 (*Sup. Ct.* 1943); *State v. Garrison,* 130 *N. J. L.* 350, 351 (*Sup. Ct.* 1943); *State v. Grundy,* 136 *N. J. L.* 96, 99 (*Sup. Ct.* 1947). *Cf. Costello v. United States,* 350 *U. S.* 359, 76 *S. Ct.* 406, 100 *L. Ed.* 397 (1956); *Notes,* 65 *Yale L. J.* 390 (1956); 62 *Harv. L. Rev.* 111 (1948). The same witnesses who testified before the first grand jury, including the eyewitness Bertha Harley, testified before the second grand jury, and in the light of the circumstances the defendant could in no wise have been prejudiced by the fact that the second grand jury knew that an earlier indictment had been returned. His present complaint grounded on that fact has no legal merit. See *United States v. Rintelen,* 235 *F.* 787, 789 (*D. C. S. D. N. Y.* 1916); *Fitts v. Superior Court in and for Los Angeles County,* 4 *Cal. 2d* 514, 51 *P. 2d* 66, 70, 102 *A. L. R.* 290 (*Sup. Ct.* 1935). *Cf. Brinegar v. United States,* 338 *U. S.* 160, 171, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879, 1888 (1949).

■■ It is contended that Indictment No. 301A–56 was "illegal, invalid, vague, uncertain and indefinite in that it charged the defendant with conflicting statutory crimes of murder." We consider this contention to be wholly without basis. Our court rules provide that it shall be sufficient in

every indictment for murder to charge that the defendant did willfully, feloniously and of his malice aforethought kill and murder the deceased. *R. R.* 3:4–3(*b*). The indictment in the instant matter used the precise phraseology set forth in the rules. In addition the State, in answer to a demand for particulars before trial, specifically advised the defendant that he was charged with willful, deliberate and premeditated murder. Thus there can be no question that the State fairly and fully discharged its obligation to notify the defendant of the nature of the offense charged against him. See *State v. Rios,* 17 *N. J.* 572, 603 (1955); *State v. Borrell,* 18 *N. J.* 16, 21 (1955); *State v. Low,* 18 *N. J.* 179, 185 (1955). The defendant complains that the indictment referred to both *N. J. S.* 2*A*:113–1 and *N. J. S.* 2*A*:113–2, but we fail to see how he could have been prejudiced by the statutory references. *Cf. R. R.* 3:4–3(*a*). *N. J. S.* 2*A*:113–1, taken from *R. S.* 2:138–1, was part of the recent general revision of the statutes relating to civil and criminal justice. Although it contained minor alterations in punctuation and language, it did not seek to bring about any substantive changes and we are entirely satisfied that the meaning of *N. J. S.* 2*A*:113–1 is identical with the meaning theretofore ascribed to *R. S.* 2:138–1. *Cf. State by Richman v. Sperry & Hutchinson Co.,* 23 *N. J.* 38, 45 (1956). *N. J. S.* 2*A*:113–1 provides, *inter alia,* that if any person in committing or in attempting to commit any unlawful act against the peace of the State, of which the probable consequences may be bloodshed, kills another, then such person so killing is guilty of murder. *N. J. S.* 2*A*:113–2 provides for the degrees of murder and sets forth, *inter alia,* that willful, deliberate and premeditated killing is murder in the first degree. The indictment in the instant matter, in charging that the defendant Richard Larry Hunt willfully, feloniously and of his malice aforethought did kill and murder Helen Elizabeth Hunt, was legally sufficient to enable his conviction of murder in the first degree. See *State v. Brown,* 22 *N. J.* 405, 412 (1956); *State v. Rios, supra; Brown v. State,* 62 *N. J. L.* 666, 669 (*E. & A.*

1899) ; *Graves v. State,* 45 *N. J. L.* 347, 358 (*E. & A.* 1883). While the statutory references in the murder indictment may not have been essential (see *R. R.* 3:4–3(*b*)), they were not inappropriate and were not misleading or harmful; their presence furnished no ground for complaint by the defendant.

 More troublesome questions which arose during the course of the trial must now be considered. After the defendant was apprehended in California he was returned by train to New Brunswick by Lieutenant Bates and Detective Spisso of the Middlesex County Prosecutor's office. The train trip began at 7:00 P. M. on August 13 and ended at 9:00 A. M. on August 16. During its course Bates and Spisso talked frequently with the defendant and Bates made written notebook entries. At the trial Bates and Spisso testified as to the information given to them by the defendant, including a crucial admission that he was struck by the baseball bat after rather than before the shooting. Spisso testified that he had not made any notes but had checked the notes made by Bates and had looked at them several days before testifying. Bates did not use his notes while he was on the witness stand but testified that he had read his notes during the preceding day and many times before that. He had arranged his information in an orderly and chronological fashion and on direct examination had testified to its substance. When the county prosecutor finished the direct examination of Bates, counsel for the defendant began his cross-examination by asking whether he could see the notes that were taken on the train. The county prosecutor objected with the comment that "if he wants to see the notes we can offer them in evidence." Defense counsel, recognizing that the notes might contain highly incompetent material, declined to consent blindly to their admission in evidence. Accordingly, they were never made available to him for his inspection or his use during the cross-examination of Bates. The defendant contends that this constituted legal error and was prejudicial to the conduct of his defense.

We are not here concerned with an application by the defendant for examination before trial of the notes made by the State's prospective witness Bates. See *R. R.* 3:5–11. Compare *State v. Tune*, 13 *N. J.* 203 (1953) with *Powell v. Superior Court*, 48 *Cal.* 2d 704, 312 *P.* 2d 698 (*Sup. Ct.* 1957). See *State v. Winne*, 27 *N. J. Super.* 304, 310 (*App. Div.* 1953); *Orfield, Criminal Procedure from Arrest to Appeal* 328–334 (1947); "*Kaufman, Criminal Discovery and Inspection of Defendant's Own Statements in the Federal Courts,*" 57 *Colum. L. Rev.* 1113, 1116 (1957). Nor are we concerned with an attempt by the State to introduce the notes as corroborative evidence. See *Springer v. Labow*, 108 *N. J. L.* 68, 71 (*Sup. Ct.* 1931). *Cf. State v. D'Ippolito*, 19 *N. J.* 540, 550 (1955); *State v. Cestone*, 38 *N. J. Super.* 139, 146 (*App. Div.* 1955). We are concerned here only with the defendant's application during the trial for production of the notes made by the State's witness Bates, in order that they might be used during his cross-examination for the purpose of testing the credibility and accuracy of the testimony given on his direct examination. It is difficult to see what plausible objection may be advanced to such use of the notes. Cross-examination is the most valuable safeguard that has been discovered in the judicial search for truth, and if cross-examination is to be at all effective it must have wide latitude in the testing of the recollection and fidelity of the witness. It seems to us that, in the instant matter, every consideration of justice and fairness dictated that the notes of the witness Bates bearing on the subject of his direct examination be made available to the defendant for use in cross-examination. See *State v. Mucci*, 25 *N. J.* 423 (1957).

In refreshing his present recollection a witness may properly examine his prior notes either before trial (*State v. Kwiatkowski*, 83 *N. J. L.* 650, 652 (*E. & A.* 1912); *State v. Martin*, 94 *N. J. L.* 139, 143 (*E. & A.* 1920)) or while he is on the witness stand (*Goodman v. Lehigh Valley R. Co.*, 82 *N. J. L.* 450, 455 (*E. & A.* 1911)). In the latter situation, courts throughout the country have generally

recognized the right to call for the notes for use in cross-examination. See *Goodman v. Lehigh Valley R. Co., supra;* 3 *Wigmore, Evidence,* § 762 (*3d ed.* 1940); *McCormick, Evidence,* 17 (1954). However, where the witness refreshes his recollection by examining his notes before trial but does not use them while testifying, the decisions are in conflict. Some courts have taken the position that "it is only where the witness uses the paper to refresh his memory while on the stand that there exists a right to compel the production of the writing for inspection." *Lennon v. United States,* 20 *F.* 2d 490, 494 (8 *Cir.* 1927); *People v. Gallardo,* 41 *Cal.* 2d 57, 257 *P.* 2d 29 (*Sup. Ct.* 1953). Other courts have taken the contrary position and, as has been well pointed out elsewhere, in principle there is no distinction to be drawn between the witness who refreshes his recollection by examining his notes before trial and the witness who refreshes his recollection by examining his notes while testifying. See *State v. Deslovers,* 40 *R. I.* 89, 100 *A.* 64 (*Sup. Ct.* 1917); *The Alpha,* 44 *F. Supp.* 809, 815 (*D. C. E. D. Pa.* 1942); *Wigmore, supra; McCormick, supra.*

In *State v. Mucci, supra,* this court recently had occasion to discuss the scope of the right of the defendant to examine and use on cross-examination materials from which the State's witnesses had refreshed their recollection prior to trial. There it appeared that on the morning of the trial several of the State's witnesses had read and discussed their earlier grand jury testimony. During the trial they testified without any reference to their grand jury testimony. In the course of its cross-examination the defense applied to inspect the witnesses' grand jury testimony which was in the county prosecutor's possession. The trial court denied the application and on appeal this was held to be reversible error. In an opinion delivered by Justice Heher, this court pointed out that although a State's witness may properly refresh his recollection by examining his grand jury testimony either before trial or while he is on the witness stand, the defense must justly be given the right to inspect the earlier testimony for purposes of cross-examination. This

court unequivocally rejected any distinction between the situation where the witness refreshes his recollection before trial from that where he refreshes it at trial, pointing out that "the one case is as compelling in reason and logic as the other"; and it expressly disapproved the holding of *State v. Brooks*, 136 *N. J. L.* 577 (*E. & A.* 1948), that where the defense demands and receives a prior statement of one of the State's witnesses and uses it on cross-examination, the statement may thereafter be introduced in evidence by the State. See 7 *Wigmore, supra,* at § 2125. *Cf. Leonard v. Taylor*, 315 *Mass.* 580, 53 *N. E.* 2d 705, 151 *A. L. R.* 1002 (*Sup. Jud. Ct.* 1944), where the Massachusetts court, while adhering to its ancient doctrine that where a party calls for and examines a document in his opponent's possession, the opponent may introduce it in evidence, expressly acknowledged that the doctrine had been widely criticized as "a survival of the notion that a lawsuit is a contest in sportsmanship" and as resulting "in the admission of otherwise incompetent evidence."

The defendant's contention that he was improperly deprived of the opportunity of inspecting and using the notes in his cross-examination of Bates finds much independent support in the principles recently embraced in cases such as *Jencks v. United States*, 353 *U. S.* 657, 77 *S. Ct.* 1007, 1 *L. Ed.* 2d 1103 (1957), *People v. Moses*, 11 *Ill.* 2d 84, 142 *N. E.* 2d 1 (*Sup. Ct.* 1957), and *People v. Riser*, 47 *Cal.* 2d 566, 305 *P.* 2d 1 (*Sup. Ct.* 1956). See *State v. Samurine*, 47 *N. J. Super.* 172, 178 (*App. Div.* 1957). *Cf. People v. Becker*, 210 *N. Y.* 274, 104 *N. E.* 396 (*Ct. App.* 1914); *Asgill v. United States*, 60 *F.* 2d 776 (4 *Cir.*, 1932); *People v. Salimone*, 265 *Mich.* 486, 251 *N. W.* 594 (*Sup. Ct.* 1933). In the *Jencks* case [353 *U. S.* 657, 77 *S. Ct.* 1013] the Government's principal witnesses were Matusow and Ford, Communist Party members who had been paid by the Federal Bureau of Investigation to make reports of party activities in which they participated. The Supreme Court reversed the conviction of the defendant Jencks because the trial court had refused to direct the

Government to produce the prior reports by Matusow and Ford for use in their cross-examination. In the course of his opinion for the court, Justice Brennan aptly stressed "the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory"; he pointed out that "flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency" and that "the omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony." Elsewhere in his opinion he noted that the defense sought the production of specific documents and did not propose any broad or blind fishing expedition among documents possessed by the Government, nor did it seek statements of any persons who had not been offered by the Government as witnesses. See *Sutherland, "The Citizen's Immunities and Public Opinion,"* 71 *Harv. L. Rev.* 85, 87 (1957). Even the dissenting opinion, while attacking the decision in its application to agencies such as the Federal Bureau of Investigation, admitted that the majority's holding might "well be a reasonable rule in state prosecutions where none of the problems of foreign relations, espionage, sabotage, subversive activities, counterfeiting, internal security, national defense, and the like exist." The *Jencks* case was followed by a Congressional enactment which, though it provided for certain procedural controls, reaffirmed rather than disavowed the basically just principle that where a Government witness has testified against the defendant, the defense is entitled to inspect and use on cross-examination the prior statements by the witness which relate to the subject matter of his direct testimony. *Pub. L. No. 269, 85th Cong., 1st Sess.* (Sept. 2, 1957), 18 *U. S. C. A.* § 3500. See *Notes,* 71 *Harv. L. Rev.* 112–117 (1957); 106 *U. Pa. L. Rev.* 110 (1957); 26 *Geo. Wash. L. Rev.* 106 (1957); 46 *Geo. L. J.* 180 (1957). *Cf. McCloskey, "Civil Liberties in the 1956 Term of the Supreme Court,"* 43 *Va. L. Rev.*

803, 821 (1957). See *United States v. Killian,* 246 *F. 2d* 77 (7 *Cir.,* 1957); *United States v. Rosenberg,* 245 *F. 2d* 870 (3 *Cir.,* 1957).

In *People v. Moses, supra,* the defendant was charged with armed robbery and at the trial identification testimony was given by several witnesses. The same witnesses had made statements to police officers on the day of the robbery and the defendant sought to inspect their statements as embodied in the police records. The trial judge directed that some, though not all, of the pertinent records be produced. On appeal the Supreme Court of Illinois reversed the defendant's conviction, holding that the defense was entitled to all of the pertinent records for its use on cross-examination. Justice Schaefer referred approvingly to Chief Judge Cooley's telling comment in *People v. Davis,* 52 *Mich.* 569, 18 *N. W.* 362 (*Sup. Ct.* 1884), that the state "has no interest in interposing any obstacle to the disclosure of the facts, unless it is interested in convicting accused parties on the testimony of untrustworthy persons." In *People v. Riser, supra* [47 *Cal. 2d* 566, 305 *P. 2d* 13], the defendant was charged with murder and before trial applied to inspect statements made by the state's prospective witnesses, Mrs. Burgess and Mr. Pantel. His application was denied. See *State v. Williams,* 46 *N. J. Super.* 98 (*Cty. Ct.* 1957); *State v. Thompson, Del. Super,* 134 *A. 2d* 266 (*Super. Ct.* 1957). At the trial Mrs. Burgess and Mr. Pantel testified. The defense again sought permission to inspect their prior statements and use them on cross-examination. Permission was denied and the Supreme Court of California expressed the view that this constituted error though not reversible error in the light of the particular circumstances there presented. In the course of his opinion for the court, Justice Traynor had this to say in answer to the arguments that the state should not be compelled to produce prior statements of its witnesses either before trial or after the witnesses have testified on direct examination:

"Originally at common law the accused in a criminal action could not compel production of documents or other evidence in the posses-

sion of the prosecution. (See 6 *Wigmore, Evidence* (3rd ed. 1940), 475–476; 8 *Id.* at 219–220.) Production was denied before trial on the ground that to compel the prosecution to reveal its evidence beforehand would enable the defendant to secure perjured testimony and fabricated evidence to meet the state's case. It was felt, furthermore, that to allow the defendant to compel production when the prosecution could not in its turn compel production from the defendant because of the privilege against self incrimination would unduly shift to the defendant's side a balance of advantages already heavily weighted in his favor. See generally *State v. Tune*, 13 *N. J.* 203, 98 *A. 2d* 881; *State ex rel. Robertson v. Steele*, 117 *Minn.* 384, 135 *N. W.* 1128; 6 *Wigmore, Evidence, supra*, at 475–476.

Whatever the force of these arguments when directed to pretrial discovery, they have little or no application when production is sought by subpoena during trial of statements referred to on cross-examination. The question then is not whether the defendant will be allowed advance disclosure of evidence upon which the prosecution plans to base its case, but whether he will be allowed any disclosure of evidence that the prosecution does not intend to produce in court at all. See *United States v. Krulewitch*, 2 *Cir.*, 145 *F. 2d* 76, 78, 156 *A. L. R.* 337. Furthermore, the additional possibility that the defendant will obtain perjured testimony or fabricated evidence as a result of disclosure at this point in the proceedings is too slight to justify denying production. The decisions of this court have always impliedly recognized that on a proper showing a defendant in a criminal case can compel production when it becomes clear during the course of trial that the prosecution has in its possession relevant and material evidence. Production has been denied, not on the ground that there was never any right to it, but because the requirements justifying production had not been met in the particular case. *People v. Gallardo*, 41 *Cal. 2d* 57, 67, 257 *P. 2d* 29; *People v. Bermijo*, 2 *Cal. 2d* 270, 276, 40 *P. 2d* 823; *People v. Glaze*, 139 *Cal.* 154, 72 *P.* 965.

There is authority to the contrary, see, *e. g., Little v. United States*, 8 *Cir.*, 93 *F. 2d* 401, 407, *certiorari* denied 303 *U. S.* 644, 58 *S. Ct.* 643, 82 *L. Ed.* 1105; *State v. Rhoads*, 81 *Ohio St.* 397, 91 *N. E.* 186, 27 *L. R. A., N. S.*, 558, but we are convinced that the better reasoned decisions support the position implicit in our cases. See *Gordon v. United States*, 344 *U. S.* 414, 73 *S. Ct.* 369, 97 *L. Ed.* 447; *United States v. Krulewitch*, 2 *Cir.*, 145 *F. 2d* 76, 78–79, 156 *A. L. R.* 337; *Asgill v. United States*, 4 *Cir.*, 60 *F. 2d* 776, 778–779; *People v. Walsh*, 262 *N. Y.* 140, 149–150, 186 *N. E.* 422; *People v. Dellabonda*, 265 *Mich.* 486, 496–507, 251 *N. W.* 594. Absent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits. To deny flatly any right of production on the ground that an im-

balance would be created between the advantages of prosecution and defense would be to lose sight of the true purpose of a criminal trial, the ascertainment of the facts. See *Gordon v. United States, supra,* 344 *U. S.* at *page* 419, 73 *S. Ct.* at *page* 373; 8 *Wigmore, Evidence, supra,* at 219–220; *cf. People v. Davis,* 52 *Mich.* 569, 18 *N. W.* 362."

■ In the instant matter the county prosecutor contends that the *Jencks* case is not binding upon us since it was not a constitutional holding but was an exercise of the court's control over the administration of federal justice. See *Rea v. United States,* 350 *U. S.* 214, 216, 76 *S. Ct.* 292, 100 *L. Ed.* 233, 236 (1956); *McNabb v. United States,* 318 *U. S.* 332, 341, 63 *S. Ct.* 608, 87 *L. Ed.* 819, 824 (1943). Assuming that to be so, it still has persuasive force and its underlying principle of broad disclosure is particularly apt in state prosecutions where there is ordinarily no countervailing consideration resting on national security. The county prosecutor also seeks to distinguish the character of the notes made by Bates from the reports made by the witnesses in *Jencks,* but we fail to discern any controlling differences. The notes were made by Bates when the defendant's statements were very fresh in his mind and even if they had never been used to refresh his recollection they would have been highly relevant to his cross-examination. After the defense had inspected them it might have found them to be simply corroborative of the oral testimony given by Bates before the jury. In such event, no one would have been harmed by the inspection. On the other hand, it might have found significant omissions, different interpretations, or even affirmative inconsistencies, which when pursued, might have brought about a truer and more accurate portrayal before the jury. In such event, the interests of justice would have been considerably advanced. Since the county prosecutor's primary function is not to convict but to see that justice is done (*State v. Orecchio, supra,* 16 *N. J.* at *page* 140) he, as well as the defense counsel, should readily welcome the wholesome principle which we now approve for the administration of justice in our State,

that where it appears that a State's witness has made prior notes or statements relating to the subject matter of the direct testimony which he has given, the defense is entitled to inspect and use on cross-examination the prior notes or statements if they are or can be made available And the principle is generally applicable without any preliminary showing of inconsistency (*Jencks v. United States, supra*) or any resulting right in the State to introduce the notes or statements as corroborative evidence on its behalf. See *State v. Mucci, supra. Cf. United States v. Rappy,* 157 *F.* 2d 964, 967 (2 *Cir.* 1946), *certiorari* denied 329 *U. S.* 806, 67 *S. Ct.* 501, 91 *L. Ed.* 688 (1947).

The defendant contends that additional error was committed when the trial court permitted Drs. Spradley and O'Connell to testify as to privileged statements made to them by the defendant. On September 28, 1956 the defendant's counsel served notice that he would appear before the trial court to request a psychiatric examination of the defendant. He did appear and on October 5, 1956 the trial court ordered that the county prosecutor arrange for a psychiatric and medical examination of the defendant by two qualified experts in order that the court might determine whether the defendant "possessed sufficient mental competence at the time of the alleged offense to be held legally responsible for the crime charged in the indictment, and also whether the defendant at this time possesses sufficient mental competence to stand trial on the aforesaid indictment or to make decisions in the conduct of his defense." The defendant was told by his counsel that he had arranged for the examination and the defendant spoke freely to the examining physicians, Drs. Spradley and O'Connell. They found the defendant to be sane and competent to stand trial and they were not called as witnesses by the defense. However, they were called by the State and were permitted to testify not only as to his sanity and competency but also as to certain statements by the defendant, including his crucial admission that he was struck with the baseball bat after rather than before the shots were fired. When Dr. Spradley was called as a

witness by the State, defense counsel objected and pointed out that the doctor was the "examining physician for the defense" and was "barred from testifying." Similarly, when Dr. O'Connell was called by the State as a witness in rebuttal, defense counsel objected, noting that the information given to the doctor was "in the nature of a privileged communication." We are satisfied that under this court's recent holding in *State v. Kociolek, 23 N. J.* 400 (1957), the statements made by the defendant to Drs. Spradley and O'Connell as to the circumstances surrounding the shooting were privileged and were erroneously admitted into evidence. See *City and County of San Francisco v. Superior Court, 37 Cal. 2d 227, 231 P. 2d 26, 25 A. L. R. 2d 1418 (Sup. Ct. 1951).*

In *Kociolek* the defense retained Dr. Spradley to conduct an examination as to the defendant's mental condition. Because of the indigency of the defendant the cost of the inquiry was paid by the county. In the course of his examination the doctor interrogated the defendant as to his knowledge of the circumstances surrounding the commission of the offense. The doctor reached conclusions unfavorable to the defendant and he was not called as a witness for the defense. However, the State called him as a rebuttal witness to contradict the defendant's testimony that he had no recollection of the offense. This court held that the information obtained by the doctor from the defendant was protected against disclosure by the attorney-client privilege and that its admission constituted error. In the course of his opinion, reversing the defendant's conviction of murder in the first degree, Justice Heher said:

"Dr. Spradley and the defendant did not bear to one another the relation of physician and patient; it was not contemplated that the psychiatrist would treat or prescribe course of treatment for the accused, such as would be deemed needful or prudent after a professional examination and diagnosis; the psychiatrist was retained by the accused's attorneys to inquire into his mental condition and competence, with particular relation to the time of the lethal acts, and to impart to his attorneys the benefit of his expert judgment and experience for their use in the preparation and presentation

of the defense; and the communications made by the accused to the psychiatrist in response to his interrogation as to the circumstances of the fatality and matters bearing upon his mental processes, and so also the consequent mental diagnosis and opinion, are privileged, just as much so as if the revelations had been made by the accused directly to his attorneys. The privilege extends to the necessary intermediaries and agents through whom the communications are made. And it includes communications between the attorney and a scientific expert retained to aid in the presentation of the defense, a confidential employment. See *Annotation*, 139 *A. L. R.* 1256. The principle is of the essence of the ancient common-law attorney-client privilege, in this country and in England and the continental countries deemed a basic civil right, indispensable to the fulfillment of the constitutional security against self-incrimination and the right to make defense with the aid of counsel skilled in the law. See *In re Selser, supra* [15 *N. J.* 393]."

The county prosecutor states that he is "not in disagreement with the *Kociolek* case" but urges that it is distinguishable because the examination here "was for all: State, defendant and court." Without passing on the issue of whether the suggested distinction might ever have any legal validity, we are satisfied that it finds insufficient factual support in the present record. The application for the psychiatric examination was made by the defendant's counsel and, as the county prosecutor acknowledged during the trial, the examination "was not at the request of the State." *Cf. State v. Auld,* 2 *N. J.* 426, 437 (1949). It was part of the preparation of the defense, and the public policy which supports the attorney-client privilege generally (*In re Selser,* 15 *N. J.* 393, 403 (1954); *State v. Toscano,* 13 *N. J.* 418, 424 (1953)) was applicable. Within the holding of *Kociolek,* the admissions made by the defendant to the doctors obtained by application of his counsel were as privileged as if they had been made directly to his counsel.

The defendant contends that the trial court erred in refusing to grant a mistrial because of a prejudicial statement made by a prospective juror in the presence of three members of the jury who had already been sworn and the remainder of the panel from which three other members of the jury were subsequently sworn. Defense counsel had asked the prospective juror whether she had read newspaper

accounts of the case and she stated that she had not but that she had heard "comments from people." Counsel then asked whether she could disregard those comments and rely only upon what she would hear during the trial and she thought that she could. He then asked her whether she was sure, and she replied as follows: "Yes. But I think I might mention, however, something that might influence me a little bit. Maybe some of you know our pastor has services in the jail and, of course, he has mentioned the defendant to me and the fact that he has been converted and has asked God for forgiveness, I think that might have a certain amount of influence in my own thinking because the man probably wouldn't be now the same as he was then." The court on its own motion excused the prospective juror and denied a motion for mistrial.

So far as the record discloses the trial court made no comments to the jurors about the aforequoted remark either at that point or in the course of its charge. In *State v. Rios, supra,* this court, in a comprehensive opinion delivered by Justice Wachenfeld, recently approved the practice of questioning prospective jurors in the presence of jurors who had already been sworn and the remaining members of the panel. However, while approving the practice, we expressly recognized that if an exceptional situation involving prejudice to the defendant does arise the trial court will be in a position to protect the defendant fully by a mistrial, if necessary, or by an admonition, if sufficient. See *State v. Rios, supra,* 17 *N. J.* at *page* 588. It seems to us that in the instant matter the trial court, in the exercise of its discretion, might well have declared a mistrial. The question asked of the juror was answered in the affirmative when she unexpectedly volunteered her remark which might readily have been interpreted as a confession by the defendant of his guilt. The case had just begun and a mistrial would have removed all suggestion of prejudice to the defendant without significantly delaying the prosecution of the indictment.

During the course of the trial a juror asked to have a doctor examine a boil on his arm. Dr. O'Connell was

called by an attendant to treat the juror. He first told the juror that he did not want to discuss the case because he might be a witness and then treated him. Counsel for the defense moved for a mistrial and his motion was denied. It is not contended that the mere treatment of a juror by a doctor during the course of a capital case, where the jurors are sequestered (*State v. O'Leary*, 110 *N. J. L.* 36 (*E. & A.* 1932); *State v. Pontery*, 19 *N. J.* 457 (1955)), calls for a mistrial. See *LaGuardia v. State*, 190 *Md.* 450, 58 *A. 2d* 913 (*Ct. App.* 1948). *Cf. State v. Roscus*, 16 *N. J.* 415, 428 (1954). Here the defendant's complaint is that the doctor called to treat the juror was a prospective State's witness who later did testify for the State. There were other doctors available and it is entirely evident that Dr. O'Connell should not have been called to treat the juror. Indeed, during the trial both the court and the county prosecutor acknowledged that the calling of Dr. O'Connell was "unfortunate." *Cf. Gold v. United States*, 352 *U. S.* 985, 77 *S. Ct.* 378, 1 *L. Ed. 2d* 360 (1957).

When the jury returned its verdict its forelady announced "We find murder in the first degree" without, however, naming the defendant. Thereupon the clerk made the following statement: "You say you find the defendant, Richard Larry Hunt, guilty of murder in the first degree, so say you all." The forelady answered "Yes." Defense counsel wanted the jury polled and thereupon the court advised the members of the jury that if the verdict stated by their foreman was their verdict they might reply "yes, that is my verdict," and that if it was not their verdict they should then state their individual verdicts. The clerk then inquired from each juror "What is your verdict" and the response in each instance was "Yes. That is my verdict." Counsel for the defense contends that the verdict was insufficient under the principles expressed in *State v. Cleveland*, 6 *N. J.* 316 (1951), and *State v. Greely*, 11 *N. J.* 485 (1953). It appears to us that even within the strict requirements of the cited cases the verdict constituted a sufficient finding that the defendant, Richard Larry Hunt,

was guilty of murder in the first degree. *Cf. State v. Vaszorich,* 13 *N. J.* 99 (1953). However, we need not pursue this issue nor need we determine whether any single one of the trial errors referred to earlier in this opinion would constitute reversible error. We are satisfied that in their aggregate they·deprived the defendant of the fair and lawful trial which was his due under our system of criminal justice. See *State v. Orecchio, supra,* 16 *N. J.* at *page* 134. *Cf. State v. Dolliver,* 150 *Minn.* 155, 184 *N. W.* 848, 849 (1921):

" '* * * the rule is that where any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of this court to reverse. *State v. Briggs,* 84 *Minn.* 357, 87 *N. W.* 935; *State v. Almos,* 122 *Minn.* 479, 142 *N. W.* 801.' "

The judgment of conviction is reversed and a new trial is ordered.

HEHER and WACHENFELD, JJ., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For affirmance*—None.