PATRICIA RUTH CAMPBELL, Plaintiff-Appellant, v. RICHARD O. FOX, M.D., Defendant-Appellee.

Fifth District No. 5—84—0298

Opinion filed July 19, 1985.

HARRISON, J., dissenting.

Judy L. Cates and Charlene E. Novick, both of Carr, Korein, Kunin, Schlichter & Brennan, of East St. Louis, for appellant.

John Jacobsen and Jerome McDonald, both of Campbell, Furnall, Moore & Jacobsen, of Mt. Vernon, for appellee.

PRESIDING JUSTICE JONES delivered the opinion of the court:

The plaintiff, Patricia Campbell, brought suit against the defendant, Richard Fox, M.D., for damages caused allegedly by his medical malpractice associated with the implantation of a silicone prosthesis in each of her breasts. A jury found in favor of the defendant, and the trial court denied the plaintiff's post-trial motion for a new trial. The plaintiff appeals from the judgment entered by the trial court upon the verdict, raising four issues: (1) whether the trial court abused its discretion in overruling a motion for mistrial upon extrajudicial contact between the defendant and a juror; (2) whether the trial court abused its discretion in overruling a motion for mistrial upon extrajudicial contact between a defense witness and a juror; (3) whether the trial court erred in refusing to admit into evidence letters between

plaintiff's former counsel and a physician who had treated her after the defendant had; and (4) whether the trial court erred in refusing to grant a new trial upon defendant's improper closing argument.

On August 22, 1980, the defendant implanted a silicone prosthesis surgically in each of the plaintiff's breasts. About two months later she developed an infection in her left breast. Ultimately, on April 24, 1981, because of infection the defendant removed the prosthesis from the left breast. The removal occurred upon the plaintiff's return from a trip begun in January of 1981 as part of the plaintiff's work as a long-distance truck driver in cooperation with her husband. During that trip an opening developed in the plaintiff's left breast through which considerable drainage escaped and the prosthesis protruded. As a consequence of the infection the plaintiff's left breast was disfigured, and she subsequently underwent plastic surgery costing about $18,000, performed by another surgeon, Dr. Lorenzo Maun, in order to correct the disfigurement. At trial, which lasted four days, the testimony of the parties diverged widely on certain crucial matters about which we shall speak later.

■ With regard to the first issue presented for review, while plaintiff's counsel was making her opening statement, one of the jurors apparently became unconscious. After asking for some "C.P.R. treatment" the trial court asked that the jury be removed. Out of the presence of the jury, the trial court recited into the record a statement of what happened as follows:

> "During the course of the opening statement, Juror Audrey Hart seemed to lose consciousness on a momentary basis. Her head rolled back and she appeared to be unconscious. The opening statements were interrupted and she was administered to by the defendant in this case, Doctor Fox, who carried her from her jury chair, her place in the jury box, to counsel table, at which point she seemed to regain consciousness and no further aid was administered at that time. The jury was removed from the courtroom and am ambulance was called. The ambulance attendants came in and removed Mrs. Hart, who was in a conscious condition at that time, and she has since been taken to the hospital and her husband is with her at the hospital and she appears to be alert and aware of what is going on.

> *** [A]t this point, it is my intention to proceed with the trial. We have already selected a jury. We are in the very early stages of the trial. We have an alternate juror present, and I don't see where this is going to be such a matter, at this point in the trial, as to be so inflammatory as to justify a mistrial,

and I intend to proceed."

Counsel for plaintiff thereupon moved for a mistrial stating:

"[O]ur foundation for [the motion] is that Doctor Fox has, literally, scooped this lady up in his arms before the entire jury panel. He carried her out of the box, laid her on the counsel table, and administered her aid, all in view of the jury. And, in light of this case, which deals with treatment rendered to our client, we do not see how this jury can any longer be fair in arriving at a verdict, and we ask that a mistrial be declared on that basis."

The trial court denied the motion for mistrial

"for the reasons previously stated, coupled with the fact that I don't feel that the way he administered, or what he did for the lady in the presence of the jury, was not that extensive and was not that involved in the course of the whole episode to the extent that I feel it is so prejudicial to justify a mistrial at this point. So, that will be the ruling of the court."

Thereafter counsel for plaintiff furnished the trial court with two questions to be asked of each juror:

(1) "Did the treatment rendered to the juror by Doctor Fox prejudice you in any way?"

(2) "Do you still feel you can be fair and impartial?"

Upon the return of the jury to the courtroom, the trial court advised the jury as follows:

"Ladies and gentlemen, I am happy to relate to you that Mrs. Hart is conscious and she is alert and she has been taken to the Franklin Hospital, as a precautionary measure, as I gather, and she is going to be under the care of Doctor Aufrecht out there. Her husband is with her and her daughter is going to be out there in a few minutes, and she appears to be fully recovered from this unfortunate episode.

I am going to place Mr. Davis in her stead for the balance of the trial. That's one reason we have alternate jurors. So, Mr. Davis, take her place over here.

I've had the bailiffs get sick on me during the course of trials and I have had jurors get sick after the case has been submitted to them for deliberation, while the jury was deliberating, but I have never experienced this problem. I am going to ask you two questions about this particular episode and I want you to answer them."

Each juror responded in the negative to the first of the two questions and in the affirmative to the second. The court then proceeded with

the trial of the case.

In her brief the plaintiff argues that "[t]he record shows on its face that an extrajudicial communication occurred which necessarily resulted in the predisposition of the jury toward the defendant." She maintains that "[i]t is difficult to conceive of a contact between a party and a juror with greater potential to influence the entire jury in its evaluation of the evidence and with greater prejudice to the plaintiff in a medical malpractice action."

It is a fundamental principle in our system of justice that, as the Supreme Court stated in the capital case of *Mattox v. United States* (1892), 146 U.S. 140, 149, 36 L. Ed. 917, 921, 13 S. Ct. 50, 53,

> "the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated."

It is generally agreed that the decision to grant a mistrial hinges on whether any jurors have been influenced or prejudiced to the extent that they would no longer be fair and impartial. (*Williams v. Board of Education* (1977), 52 Ill. App. 3d 328, 367 N.E.2d 549.) A determination of this question involves the court's consideration of all the facts and circumstances and conjecturing upon the effect that the incompetent information has had upon the minds of the jurors, a determination that is incapable of absolute accuracy or a very high degree of reliability. (*People v. Hryciuk* (1954), 5 Ill. 2d 176, 125 N.E.2d 61.) This determination is within the sound discretion of the trial court. *Williams v. Board of Education* (1977), 52 Ill. App. 3d 328, 367 N.E.2d 549.

Although we have been cited to, and our research has disclosed, no case in which a party ministered to a juror, we are aware of two cases in which a witness provided medical treatment to a juror, *Smith v. State* (1962), 218 Ga. 216, 126 S.E.2d 789, and *State v. Hunt* (1958), 25 N.J. 514, 138 A.2d 1. In *Smith* the defendant was found guilty of murder. During his trial, while the jurors were quartered in a hotel, one of the jurors became ill. A physician who had testified as a witness for the prosecution was summoned by a bailiff and remained in the presence of the juror who was ill and others for about 20 minutes. The trial court found that the bailiff who had summoned the physician did not realize that the physician had been a witness but called that particular physician because he was in such a place as to be able to respond quickly. The bailiff was present while the physician attended the juror, and neither the bailiff, the physician, the juror who was ill, nor the other jurors who were present engaged in any

discussion whatever of the case on trial. The reviewing court, in ruling that the handling òf the event was not cause for a new trial, relied upon the principles that "a mere trifling and immaterial irregularity in the conduct of a juror will not require the grant of a new trial" and that "an irregularity without opportunity for injury will not require the grant of a new trial." (218 Ga. 216, 222, 126 S.E.2d 789, 794.) The State, the court said, had carried the burden of showing that the defendant sustained no injury.

In *Hunt* the defendant was convicted of murder and sentenced to death. During the course of the trial a juror asked to have a doctor examine a boil on his arm. A physician who had examined the defendant, had found him competent to stand trial, and later testified for the State was called by an attendant to treat the juror. Prior to treating the juror, the physician told the juror that he did not want to discuss the case because he might be a witness. Defense counsel moved for a mistrial, and the motion was denied. The defendant argued that the doctor called to treat the juror was a prospective State's witness who later did testify for the State. The court of review stated:

> "There were other doctors available and it is entirely evident that [the physician in question] should not have been called to treat the juror. Indeed, during the trial both the court and the county prosecutor acknowledged that the calling of [this doctor] was 'unfortunate.' " (25 N.J. 514, 535, 138 A.2d 1, 12-13.)

The court reversed, ordering a new trial without determining whether any single one of the numerous trial errors considered would constitute reversible error, concluding that the errors in their aggregate had deprived the defendant of a fair trial.

In the case at bar an emergency arose in the courtroom. The defendant surgeon was apparently the only doctor immediately available, and no communication concerning the case occurred between him and any of the jurors. No one suggests that the defendant acted with the intent to influence the jury. At the time he picked up the unconscious juror, it could not have been known whether she was seriously ill, requiring the services of a physician. As it happened, the defendant did nothing more for her than a lay person could have done, the juror apparently having revived spontaneously and virtually immediately. Upon being summoned into the courtroom again, the jury was advised of the juror's condition, the incapacitated juror was replaced by an alternate, and the jury was *voir dired* concerning its ability to be fair and impartial in the wake of this incident.

Furthermore, we do not think that a different result would have obtained had a mistrial been granted. As we indicated earlier, the

credibility of the witnesses appears to have been of critical importance to the jury's determination. The record shows that the plaintiff testified that she had sought the defendant's services because of soreness and tenderness of her breasts around the time of menstruation and because of "sagging" of her breasts. She denied that she had requested that her breasts be enlarged. The defendant, and his nurse Judith Ann Eubanks, testified, however, that the plaintiff had sought augmentation mammaplasty, which is the surgery that was performed upon her in August of 1980, in order to enlarge her breasts. One of the expert witnesses, Dr. Lisle Wayne II, testifying for the defendant, stated that augmentation mammaplasty is never performed for other than cosmetic reasons.

A crucial matter in the determination of negligence in the instant case was when the defendant had recommended to the plaintiff that the prosthesis in her left breast be removed. One of plaintiff's expert witnesses, Dr. Clifford Coleman, testified that, in view of the infection, failure to remove the implant in December of 1980, as long as the patient agreed to the removal of the implant, would have been a deviation from the standard of good medical care and that, conversely, recommending removal of the implant to the patient at that time would have accorded with such a standard. The plaintiff testified that the defendant did not advise her that the prosthesis in question should be removed until several months later, in April of 1981, when the prosthesis was in fact removed. The defendant testified that as a consequence of the infection he had discussed the removal of the prosthesis with the plaintiff in December of 1980 but that she had cried and said that she would not give it up. He testified that at that time she had stated that she had not been taking the antibiotics for over two weeks and that she agreed to take them in order to combat the infection and to retain the prosthesis. He stated that she had not been keeping her scheduled appointments with him and that she, likewise, promised to do so. The defendant had not recorded in his notes his discussion with the plaintiff concerning the removal of the prosthesis or her refusal to let him remove it. On cross-examination Dr. Wayne testified that it is good medical practice for a physician to note in his records his recommendation and a patient's refusal to follow it. The plaintiff testified that she had taken faithfully the antibiotics prescribed but that the defendant had, despite her having told him that she had been doing so, concluded that she had not. The plaintiff stated that she had failed to keep several appointments with him because, for example, on one occasion her grandfather had died and on another her house had burned down but that she had, contrary to his

testimony, each time called, in advance when possible, to explain and to make another appointment. The testimony of the defendant's nurse corroborated that of the defendant with regard to the plaintiff's failure to take the antibiotics prescribed, the defendant's recommendation concerning the removal of the implant in December of 1980, and the plaintiff's response to his recommendation of removal. Ms. Eubanks testified further that the plaintiff was reluctant to have the prosthesis removed in April of 1981. There were other points on which the testimony of the parties diverged, but we need not set forth each such detail exhaustively.

With respect to the credibility of the plaintiff, she testified on cross-examination that she had taken no drug "for nerves" and did not "remember" taking the drug Valium, which is a central nervous system depressant, prior to defendant's implantation of the prosthesis in August of 1980. However, the plaintiff had signed an admission questionnaire concerning the hospitalization which showed that she was taking 5 milligrams of Valium twice daily at the time of admission. The defendant testified concerning plaintiff's hospital records that she had stated to him upon her admission in August of 1980 that she was taking 5 milligrams of Valium three, not two, times daily. The defendant had recorded this information under the "history and physical examination" section of her hospital record concerning "habits, drugs." Similarly, the admitting nurse's note for August 21, 1980, at 5 p.m. states that the patient was taking 5 milligrams of Valium twice daily. Also during cross-examination, the plaintiff reiterated her testimony upon direct examination that she had been married in 1974. In response to questioning she testified that her daughter had been born in August of 1974 and then stated that she had been married in November of 1973. Upon further questioning she admitted that she had, in fact, been married in 1974. During her testimony the plaintiff used, in order to refresh her memory, certain calendars upon which she had made various notations concerning matters relating to her care and to the course of her illness. However, at her deposition taken prior to trial, certain pages of the calendars were photocopied, and showed no notations for certain pertinent dates that, by the time of trial, bore such notations. Thus, the record shows that the jury could have concluded from the evidence that the plaintiff was not a credible witness. It does not appear from the record that, had the incident concerning the defendant's aid to the unconscious juror not occurred, the outcome would have been different. We conclude that the trial court did not abuse its discretion in refusing to grant the plaintiff's motion for mistrial.

■ With regard to the second issue the plaintiff raises, concerning extrajudicial contact between a defense witness and a juror, the record shows that at the beginning of the second day of trial the counsel for the plaintiff informed the court as follows:

"Yesterday, after the Court recessed and dismissed the jury, it has come to our attention that the plaintiff was seated downstairs, at which time a juror, Mrs. Mary Atchison, also came downstairs and, evidently, voiced some feelings that she was feeling ill. Our plaintiff asked her if she could get her a glass of water, and Mrs. Atchison, indicated, no. And, so, the plaintiff left her. Mrs. Atchison evidently still wasn't feeling well and while our plaintiff was standing in the hallway waiting for us to come downstairs, she observed Judith Eubanks, who is going to testify in this case, go up to Mrs. Atchison and begin talking with Mr. Atchison. Mrs. Eubanks was dressed in a green surgical-type of affair, a gown. I don't know whether Mrs. Atchison knows who she is, or not, but there was communication between a juror and a potential witness in this case. I don't know if Mrs. Atchison is even here yet, this morning. So, I am asking the Court to declare a mistrial on that basis."

The trial court informed counsel that a motion for mistrial would have to be provided in writing supported by an affidavit containing facts setting forth what she asserted to be true. At that time the trial court would examine them and conduct whatever inquiry was necessary,

"after this Court is furnished with something to act upon. I can't just respond to just naked allegations of counsel. You weren't there. You don't know what happened, and there's no basis shown at this point in the record for a mistrial. If you want me to pursue it, then you can file a proper motion and affidavit and I will act, accordingly."

Counsel for plaintiff stated that the plaintiff had not been close enough to hear what was said. The trial court advised counsel that her client could reduce her, *i.e.*, plaintiff's, assertions to writing and that he would act accordingly but that he would not "conduct a fishing expedition with a juror in the middle of a trial, without something to hang my hat on."

Later, at the close of the plaintiff's case, she renewed the motion for mistrial based upon the fainting of the juror Hart and for other reasons "as well as the information I informed the Court of, with regard to Judy Eubanks communicating with a juror. I believe her name was Mary Atchison." The court denied the motion, stating:

"The Court notes that you had two days to file an affidavit, or

make some presentation with regard to the allegations concerning the juror, Mrs. Atchison, and the witness, and no such affidavit has been forthcoming and the Court has before it nothing, except the mere allegations of counsel, and I simply will not conduct a fishing inquiry into the conduct of a juror, without something to justify such a delicate and complicated procedure."

Citing *Loucks v. Pierce* (1950), 341 Ill. App. 253, 93 N.E.2d 372, the plaintiff asserts that the trial court is required to undertake an investigation of the circumstances when an officer of the court reports jury misconduct or irregularity. Plaintiff seems to suggest in her reply brief that since neither plaintiff nor her counsel could provide the court with the substance of the alleged conversation between juror and witness, *Loucks* required the court to examine the participants in the alleged conversation. *Loucks* sets forth no such requirement, nor should it. The record shows that the trial court in the instant case attempted to undertake an investigation of the alleged impropriety by requiring the plaintiff, and not her counsel as counsel suggests, to file an affidavit in support of a motion for mistrial. This the plaintiff failed to do, halting any further investigation. Hence, it was not an abuse of discretion for the trial court to deny this motion for mistrial.

■ With respect to the third issue the plaintiff raises, the plaintiff sought to introduce a letter from former counsel for plaintiff to Dr. Wayne and Dr. Wayne's letter in response to it in which the doctor stated that he was "not at liberty or not qualified" to answer the questions posed in counsel's letter. Dr. Wayne had treated the plaintiff briefly following the defendant's treatment of her. The plaintiff sought to introduce the correspondence in order to impeach the witness' qualifications to testify and to show his bias in favor of the defendant. The trial court sustained the defendant's objection to admission of this correspondence

"because that letter is vague, as to what the doctor is referring to, and would require the Court to also submit the letter from the lawyer Irvin to the jury, so the jury would be placed in a position of trying to analyze the letter of lawyer Irvin to determine which of the questions the doctor may have been referring to in his letter *** and place an enormous burden on the jury to determine what this ambiguous statement of the doctor means, and would result in confusion to the jury and create a number of secondary issues and would serve no useful purpose, in my judgment."

We have examined the letters in question and agree with the trial

court's assessment. Furthermore, the phrase by which the plaintiff sought to impeach the witness with regard to his qualifications is taken from the following sentence: "There are many questions and many areas of concern which you expressed in your letter and I am either not at liberty or not qualified to answer many of your questions." In context the phrase is, we think, of highly dubious value to accomplish plaintiff's expressed purpose. In addition, as the trial court pointed out in response to plaintiff's contention that she had been denied effective cross-examination of the witness as a result of this ruling, she engaged in thorough cross-examination of him over the course, according to the trial court, of at least 1½ hours. The scope of the cross-examination of witnesses is within the sound discretion of the trial court (*Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 379 N.E.2d 306), and we find no abuse of that discretion here.

■ In the fourth and final issue plaintiff presents for review, she complains of the following remarks of defense counsel made during closing argument:

> "So, it's up to you, in looking at these two people and hearing them testify and knowing something about their background, as to who you are going to believe. Are you going to believe a reputable surgeon, who has practiced here in this county since 1961, or are you going to believe somebody that's got this lawsuit against him?"

The plaintiff did not object to the remark at the time it was made, during trial; hence, the issue is waived for review. (See *Senase v. Johns* (1981), 96 Ill. App. 3d 164, 420 N.E.2d 1104.) Even if the issue were not waived, we think that the remark, though regrettable, would constitute, under the circumstances of the instant case, but harmless error.

Affirmed.

KASSERMAN, J., concur.

JUSTICE HARRISON, dissenting:
While the decision of whether or not to declare a mistrial rests within the sound discretion of the court, a mistrial should be declared when the trial is interrupted by some occurrence of such a character that, because of it, one of the parties cannot have a fair trial. (*Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 359, 366 N.E.2d 397.) Precisely such an occurrence took place here, where defendant, in the presence of the entire jury, carried the stricken juror from her chair and tended

to her. While there is nothing to suggest that defendant's actions resulted from anything less than admirable and humanitarian motives, it simply defies common sense and human experience to hold, as the majority does, that the issue of defendant's alleged malpractice could be fairly resolved by jurors who had just watched defendant rescue their fallen counterpart.