**GOVERNING BOARD, The Daughters of the American Revolution House—The Freeman Plantation, Texas Society, Daughters of the American Revolution, et al., Appellants,**

v.

**Mrs. F. Hastings PANNILL, State Regent, Texas Society, Daughters of the American Revolution, Inc., et al., Appellees.**

**FORT BEND CHAPTER, The National Society, Daughters of the American Revolution, et al., Appellants,**

v.

**Mrs. F. Hastings PANNILL, Mrs. Jesse M. Deware, III, et al. and the Attorney General for the State of Texas, Appellees.**

No. 09 82 081 CV.

Court of Appeals of Texas, Beaumont.

June 16, 1983.

Rehearing Denied Sept. 21, 1983.

J.R. Cornelius, The Cornelius Law Firm, Jefferson, John J. Eikenburg, Clark G. Thompson, Monroe R. Talley, Houston for appellants.

James K. Peden, III, Dallas, Jesse M. DeWare, IV, Jefferson, Michael Maness, Theo. Pinson, Greenwood, Koby, Old Pinson & Bussey, Houston, Welby Parish, Gilmer, for appellees.

## OPINION

BROOKSHIRE, Justice.

The appellants, plaintiffs below, on April 1, 1975, brought this cause of action originally, apparently, in the form of a trespass to try title suit, in the District Court of Marion County, Texas. The appellants are boards and chapters of the Texas Society of the National Society of the Daughters of the American Revolution. In the initial pleadings there were member chapters and individual plaintiffs acting on behalf of the member chapters of the Texas Society of the Daughters of the American Revolution. This litigation encompassed, at an earlier time, approximately fifty-two (52) chapters and approximately several hundred individ-

uals as plaintiffs. The defendants were Mrs. F. Hastings Pannill, Mrs. Claire McElroy, Mrs. Georgia B. Edman and Mrs. Kenneth Wickett, who were the respective regents (presidents) and treasurers of the Texas Society of the D.A.R. from 1973 to 1979. Mrs. Virginia Battle DeWare, Jesse M. DeWare, IV, and Diane Ellen DeWare Bumpus, were also defendants, who had purchased certain real property, improvements and personal property known as the Freeman Plantation or the Freeman Plantation House (being an historical house) from the Texas Society. Mr. C. Leland Hamel, a former counsel of the Texas Society, was also a defendant in a second lawsuit. The relief for which the petition pleaded was to set aside and cancel the deed and sale of the Freeman Plantation to the DeWares and to recover pecuniary damages alleged to have been sustained by the Texas Society of the D.A.R. in connection with the sale of the Freeman Plantation or Freeman Plantation House.

Before 1971, the Texas Society owned an historic building in Austin, Texas, which was used as a museum and headquarters. This historic property was condemned and taken by the Urban Renewal Agency of Austin, Texas. Then the Texas Society purchased an historic house (the Freeman Plantation) in the City of Jefferson, Marion County, Texas, for use as its main headquarters facility and also as a suitable building for antiques, furniture, genealogical papers and certain records of the State Society. This litigation has been prolonged. See *Ex Parte Edman,* 609 S.W.2d 532 (Tex. 1980); *Texas Soc. v. Fort Bend Chapter,* 590 S.W.2d 156 (Tex.Civ.App.—Texarkana 1979, writ ref'd n.r.e.); *Governing Board v. Pannill,* 561 S.W.2d 517 (Tex.Civ.App.— Texarkana 1977, writ ref'd n.r.e.). These three (3) appellate decisions and opinions contain important background information and history concerning this subsequent appeal. After three (3) appellate encounters, a jury trial on the merits was conducted resulting in a verdict in which the jury found the sixty (60) special issues generally in favor of the appellees. The district court signed and rendered a judgment that these appellants, as plaintiffs, take nothing.

■ This appeal brings forward forty-one (41) points of error, all extremely well briefed, as well as sixteen (16) "reply points" and two (2) counterpoints, equally well briefed and argued. At the March, 1975, State Conference of the Texas Society, a certain motion was made and seconded that the Freeman Plantation be appraised and sold at fair market value. A standing vote was taken on the motion to sell with the results of one hundred fifty-eight (158) pro votes and one hundred forty-two (142) con votes. Certainly one of the major points of the appeal is that *the one hundred fifty-eight (158) to one hundred forty-two (142) standing vote tally was not a majority of the votes entitled to be cast by the members present.* Appellants first six (6) points of error attack the efficacy of the March, 1975, conference vote to authorize or empower the sale of the Freeman Plantation.

The appellants' initial six (6) points of error challenge Special Issue No. 11. Special Issue No. 11:

"Do you find from a preponderance of the evidence that the sale of the Freeman Plantation was authorized by less than a majority of the votes entitled to be cast by the members present when the voting was conducted at the 1975 TSDAR State Conference?

"Answer 'We do' or 'We do not'.

"We do not."

The appellants say that the negative answer of the jury is erroneous as a matter of law; that the trial court committed error in overruling plaintiffs' motion for instructed verdict and motion non obstante veredicto to the effect that the motion to sell the Freeman Plantation was not adopted by a majority vote; that there is no evidence to support the jury's negative answer; that the jury's negative answer is not supported by sufficient evidence and is so against the overwhelming weight and greater preponderance of the evidence as to be manifestly wrong and unjust, and that the sale of the Freeman Plantation was simply not autho-

rized by the 1975 State Conference. The official proceedings of the 1975 Texas Society State Conference, in the form of a printed book, are in the record, the printed book having been introduced as an exhibit. During the Thursday morning, March 20th, 1975, business meeting, the State Chairman of Credentials, Mrs. B.A. Grainger, reported three hundred forty-two (342) voting delegates registered as of 9:00 o'clock P.M. on March 19, 1975, being the preceding day. Apparently, from the record, there were no later reports from the credentials committee as of March 20th. At the March 20, 1975, morning business meeting, Mrs. Thomas M. Daniel, Regent, Major James Kerr Chapter, introduced the following motion:

"'In order to end this controversy which is destructive to the Texas Society and distasteful to individual chapters, I move the Freeman Plantation be appraised and sold at fair market value. The State Regent is authorized to sign the necessary papers.'"

This motion to sell the plantation was seconded by Mrs. Stanley A. Schmidt, Regent, Ol' Shavano Chapter. Immediately thereafter, Mrs. Delores Mohrle, the Registered Parliamentarian, ruled and stated that, according to the Standing Rules, this was a "main motion and would have to be referred to the Resolutions Committee." This morning business session was then recessed at 12:00 noon.

During the business meeting, held on Thursday afternoon (2:00 P.M.), March 20, 1975, the following transpired:

"The State Regent, Mrs. Fitzhugh Hastings Pannill, called the meeting to order at 2:00 p.m. Mrs. Henry G. Richardson, State Chairman, Resolutions Committee, brought the motion made by Mrs. Thomas Daniel, Major James Kerr Chapter, pertaining to the sale of Freeman Plantation. Discussion followed and an amendment was introduced to keep the DAR House until after 1978 in order to celebrate the Bicentennial. Mrs. Pannill requested Mrs. O'Neill, State Parliamentarian, to inform the Assembly of Parliamentary procedure at this point. Time of

debate period of ten minutes and a simple majority is required for either the amendment or the motion. The amendment was lost by a standing vote of 163 to 128. The motion to sell the Freeman Plantation was passed by a standing vote of 158 pro and 142 con."

Texas Non-Profit Corporation Act, TEX. REV.CIV.STAT.ANN. art. 1396–2.02. A. (5) (Vernon 1980) empowers non-profit corporations:

"To sell, convey, mortgage, pledge, lease, exchange, transfer, and otherwise dispose of all or any part of its property ...."

Article 1396–2.12. A. first provides, generally, that one-tenth (1/10th) of the votes entitled to be cast shall constitute a quorum. Then article 1396–2.12. A. reads:

"The vote of the majority of the votes entitled to be cast by the members present, or represented by proxy at a meeting at which a quorum is present, shall be the act of the members meeting, unless the vote of a greater number is required by law, the articles of incorporation, or the by-laws."

We construe article 1396–2.12. A. that, to constitute a majority in conformity with the statute, fifty percent (50%) plus one (1) of the votes actually cast is not the meaning of the plain language of article 1396–2.12. A. The definitive, determinative question follows. What is a majority of the votes, under article 1396–2.12. A., which reads:

"The vote of the majority of the votes entitled to be cast by the members present ... shall be the act of the members meeting ...."

Following the plain language of the statute, this construction, in certain factual situations, would certainly be different from a majority of the votes cast. This is patently true because if a sufficient number of the voters, or delegates, although present, abstained; then to obtain a majority of the votes, the motion would have to carry by fifty percent (50%) plus one (1) of all the members entitled to vote and being actually present, rather than merely fifty percent

(50%) of the votes plus one (1) of the votes actually cast. We think that the plain, unambiguous wording of article 1396–2.12. A. compels us to this construction. Although we agree with the construction and interpretation of article 1396–2.12. A., as urged by the appellants, yet, because of the evidentiary or factual record before us, we hold that the jury had the right and prerogative to answer Special Issue No. 11 as it did and, further, that the jury's answer to Special Issue No. 11 is not contrary to law and is supported by sufficient evidence to make same a valid finding; the "We do not" answer of the jury is not against the overwhelming weight and preponderance of the evidence so as to make it clearly wrong and unjust.

On Special Issue No. 11, the testimony of one Jayne Dawson Brainard (which the jury within their prerogative had a right to believe) becomes important and significant. We quote:

"DIRECT EXAMINATION

"BY MR. PARISH:

"Q. Would you state your name for the record, please?

"A. Jayne Dawson Brainard.

. . . .

"Q. Are you a member of the Texas Society Daughters of the American Revolution?

"A. Yes, I am.

"Q. And how long have you been a member?

"A. About twenty-two years.

"Q. Have you been active in the affairs of the Texas Society Daughters of the American Revolution?

"A. Yes.

"Q. How long have you been active?

"A. About twenty-two years.

"Q. Are you a member of any particular chapter?

"A. I'm a member of Los Viboleros.

. . . .

"Q. Have you held any official offices with the Texas Society Daughters of the American Revolution?

"A. Yes, I have been state historian, state recording secretary, State Vice-Regent, and I'm currently the State Regent.

"Q. All right, when were you state historian? Let's take those in the order that you gave me.

"A. All right. I was state historian in 1967 to '70. I was state recording secretary from 1970 to '73. I was State Vice-Regent from '76 to '79. I am State Regent from '79 to '82.

"Q. All right. Back in 1975, were you active in the TSDAR?

"A. Yes, I was state conference chairman when the state conference was held in Amarillo.

"Q. Were you present at the time that a motion was made on the floor to sell the Freeman Plantation?

"A. Yes, I was.

"Q. Were you a delegate to that conference?

"A. I was not a delegate.

"Q. In connection with the people who were present on the floor at the time that motion was made, did all the people that were there as delegates vote?

"A. Not at the time the motion was made.

"Q. When it was called for a vote?

"A. You mean when the vote was called that afternoon. To the best of my knowledge, I was standing at the back of the room and not being a delegate, the delegates were in one section—the people that did not vote, the members that were attending who were just there, were at the back of the room.

"But to the best of my knowledge, everybody voted.

"Q. You were able to observe and see what was going on?

"A. Yes, while each one was counted.

"Q. Now, how was the vote taken, Mrs. Brainard?

"A. It was a standing vote. A count-off vote which is the custom with the Texas Society. Each person would say— the tellers would stand at one of the rows

and each person would count off their number—one, two, three, four, five—

"Q. Did they stand or sit down?

"A. They stood up. As each row is counted, they sat down.

"Q. You observed each of the rows where they stood up and counted?

"A. They all stand up at the same time and as they're counted, then they sit down."

Mrs. Mohrle was proffered as a professional parliamentarian by the defendants and she testified as to her educational background, training and qualifications. She was registered with the National Association of Parliamentarians. Mrs. Mohrle acted as the professional parliamentarian at TSDAR's State Conference in 1975. She testified that she attended all of the 1975 State Conference. She testified at some length concerning the motion to sell the Freeman Plantation. That, among other things, it was ruled a main motion and sent to the resolutions committee and that she had ruled that the motion could be passed by a majority vote rather than a two-thirds (⅔rds) vote. An attempt was made to amend the original main motion. The amendment failed. There was debate on the amendment to the motion to sell the Freeman Plantation, as well as the motion to sell, itself. After the debate, the motion to sell the Freeman Plantation was passed. The high point of her testimony was:

"Q. You vote on the amendments first and then you go back to the main motion; is that right?

"A. Yes.

"Q. And tell the jury whether or not the motion to sell the Freeman Plantation was duly passed by the majority at the state conference?

"A. Yes, it was."

Virginia Biggers was called to the witness stand by the plaintiffs. She testified unequivocally, from her personal knowledge, that there were voting delegates that left the 1975 State Conference, prior to the noon hour on the date of March 20, 1975.

The jury observed the witnesses in the witness chair and their demeanor and be-havior. The jury could have reasonably concluded that the number of three hundred forty-two (342) voting delegates registered as of 9:00 P.M., March 19, 1975, had diminished in their present attendance at the afternoon business session of March 20, 1975, when the crucial motion to sell the Freeman Plantation was actually voted upon. The jury had the right, power and prerogative to conclude, under the record, that all of the voting delegates present at the crucial business session cast their votes, either pro or con, on the Freeman Plantation sale motion, with one hundred fifty-eight (158) for the sale and one hundred forty-two (142) against; hence, 300 present and voting. The jury could conclude that forty-two (42) of the voting delegates did not attend the afternoon business session of March 20, 1975.

Article 1396–2.12. A. of the Texas Non-Profit Corporation Act provides:

"The *vote of the majority of the votes entitled to be cast by the members present* . . . at a meeting at which a quorum is present, shall be the act of the members present . . . ." (emphasis ours)

Hence, the jury could have reasonably concluded and found, as it did, that a majority of the *votes entitled to be cast by the members present voted in favor of passing the motion to sell the Freeman Plantation.*
WEBSTER'S THIRD INTERNATIONAL DICTIONARY 1793 (Unabridged 1967) defines "present" as:

"Being in one place and not elsewhere; being within reach, sight or call or within contemplated limits; being in view of or at hand . . . used interjectionally to indicate one's presence esp. in answer to a roll call . . . ."

BLACK'S LAW DICTIONARY 1347 (Rev. 4th Ed. 1968) defines "present" as:

"Now existing; at hand; relating to the present time; considered with reference to the present time."

One of the "conference standing rules" governing the 1975 State Conference provided:

"3. Doors shall be closed during each business meeting and shall be opened at the direction of the Regent. No seating shall take place during the program."

Hence, the jury, well within their prerogative of weighing the evidence, could have answered Special Issue No. 11 to the effect that the motion to sell the Freeman Plantation was carried by a proper, legal and lawful majority vote.

Since the cluster of appellant's Points of Error numbers 1 through 6, both inclusive, are concerned with matters of the quality and quantity of the evidence and include a "no evidence point", an "insufficient evidence" point and an "overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust" point, we must bear in mind the rules governing our review of these points. In passing on the "no evidence" point we may consider only the evidence and the inferences therefrom which tend to support the jury's verdict, and disregard all the evidence and inferences to the contrary which are against the verdict and the findings of the jury. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error" 38 TEXAS L.REV. 361 (1960); Garwood, "The Question of Insufficient Evidence on Appeal" 30 TEXAS L.REV. 803 (1952). When the points of error are to the effect that the evidence is insufficient to support a fact finding by the jury, or that the finding is so against the great weight and preponderance of the evidence as to be clearly and manifestly wrong and unjust, we must examine all of the evidence and reverse and remand for a new trial if we conclude that the evidence is factually insufficient to support the jury's finding on a controlling, ultimate fact issue or that the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust or manifestly wrong and unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). Under this record, the appellants' motion for instructed verdict was not proper and neither was the motion non obstante veredicto. Following the rules and guidelines set out by these landmark cases, we overrule appellants' Points of Error Nos. 1, 2, 3, 4 and 5.

Article 1396–2.02. A(5) provides:

"A. Subject to the provisions of Sections B and C of this Article, each corporation shall have power:

. . . .

"(5) To sell, convey, mortgage, pledge, lease, exchange, transfer and otherwise dispose of all or any part of its property and assets."

Article 1396–2.14., in pertinent part, provides:

"A. The affairs of a corporation shall be managed by a board of directors, or trustees . . . ."

Article 1396–5.08. provides:

"A. Any corporation may convey land by deed, with or without the seal of the corporation, signed by the president or vice-president or attorney in fact of the corporation when authorized by appropriate resolution of the board of directors or members. Such deed, when acknowledged by such officer or attorney in fact to be the act of the corporation, or proved in the manner prescribed for other conveyances of lands, may be recorded in like manner and with the same effect as other deeds. Any such deed when recorded, if signed by the president or any vice-president of the corporation, shall constitute prima facie evidence that such resolution of the board of directors or members was duly adopted."

The TEXAS SOCIETY NATIONAL SOCIETY, DAUGHTERS OF THE AMERICAN REVOLUTION 23 (76th Annual State Conference 1975), Bylaws, Art. 8, entitled "State Executive Board" states:

"Section 1. The officers of the State Society and the officers of the National Society whose membership is in a Chapter in the State of Texas shall constitute the State Executive Board.

"Section 2. The State Executive Board shall have *all power and authority* over the affairs of the State Organization *during the interim between meetings of*

*the State Society,* excepting that of modifying any action taken by a regular or special meeting of the State Conference, provided that no debt or liability shall be incurred in excess of the regular income of the State Society.

"Section 3. Regular meetings of the State Executive Board shall be held three times each year at the call of the State Regent.

"Section 4. Other meetings of the Board may be called by the State Regent and shall be called upon the written request of at least five members of the Board provided that at least five days' notice be given of the time, place and purpose of the meeting.

"Section 5. Six members of the Board shall constitute a quorum.

"Section 6. A standing committee of the Executive Board, composed of the State Regent, State Vice-Regent, State Recording Secretary, State Treasurer and State Curator shall administer the affairs of the Texas DAR State Forest, subject to the approval of the State Executive Board." (emphasis added)

The State Executive Board, by virtue of the above statutory provisions and bylaws, is empowered with all power and authority to manage the affairs of the society during the stated interim. After the adjournment of the State Conference of March, 1975, the State Executive Board met in the following month. At the April, 1975, State Executive Board meeting, the board voted to authorize Mr. C. Leland Hamel to proceed with the preparation of the necessary documents to sell the Freeman Plantation. This action was taken after noting and reviewing certain appraisals of the Freeman Plantation. In June of 1975, the State Executive Board met at the home of the State Parliamentarian, Mrs. Lewis P. O'Neill, in Dallas, Texas. At this meeting there was extended discussion of the status of the pending litigation in the District Court of Marion County. In fact, detailed actions taken by the then trial judge, Judge Morris Ralston, concerning injunctions and concerning the plea of privilege, were discussed. At the same meeting, it was announced that the district judge

had allowed the DeWare family to move into the house and that the judge had ruled that TSDAR could remove the remaining State DAR property (that which came from the original Austin historical house and other gifts not included in the Freeman Plantation personal property when same was originally bought by the society from a Mr. and Mrs. Palmer Hayworth).

After a reading and discussion of the third amended original petition filed and writ obtained by the "Governing Board-Freeman Plantation" were completed, the following motion was made:

" 'I move the Executive Board of the Texas Society DAR ratify the sale of the real and personal property (that came with the Freeman Plantation) to the DeWare family on April 26, 1975.' "

Moved by Mrs. Parkinson, seconded by Mrs. Doom, the motion passed unanimously (extracted from the Minutes of the Meeting of the State Executive Board held on June 12, 1975, in Dallas, Texas).

The paramount thrust of appellants' Points of Error Nos. 1, 2 and 6, may be fairly stated to the effect that the officers of the Texas Society Daughters of the American Revolution, throughout the sale of the Freeman Plantation to the DeWares, acted without proper and lawful authority. In view of article 1396–2.02. A., 1396–2.14. A., 1396–5.08. A., and the subsequent action of the State Executive Board in authorizing the sale and in 1977 the action of authorizing, ratifying and confirming the sale by the State Conference, we find Points of Error Nos. 1, 2 and 6 to be without force of reversible error. Moreover, the jury, in answer to Special Issue No. 43 found that the State Executive Board of TSDAR authorized the sale of the Freeman Plantation to the DeWare defendants and in answer to Special Issue No. 44 the jury found that the sale to the DeWare defendants of the Freeman Plantation and the furniture and furnishings therein was ratified and confirmed by the State Executive Board. In Special Issue No. 45, the jury found that the sale of the Freeman Plantation to the DeWare de-

fendants was ratified and confirmed by a majority of the votes entitled to be cast by the members present. Then the jury found, in Special Issue No. 46, that the majority of the delegates entitled to vote and present at the 1976 TSDAR Conference ratified and confirmed the sale of the Freeman Plantation to the DeWare defendants with full knowledge at the time of the voting of all material facts and circumstances concerning said sale.

The jury found in Special Issue No. 49 that the sale of the Freeman Plantation and the personal property therein to the DeWares was ratified and confirmed by a majority of the votes entitled to be cast by the members present at the 1977 TSDAR State Conference and, further, in Special Issue No. 50, that the majority of the votes entitled to be cast by the delegates present at the 1977 TSDAR State Conference ratified and confirmed the sale of the Freeman Plantation and the personal property to the DeWares with full knowledge at the time of voting of all material facts and circumstances concerning the sale. In view of the record and in view of these jury findings, we overrule under a second, separate theory appellants' Points of Error Nos. 1, 2 and 6. And perforce of logical deductions and conclusions of the separate theory, we necessarily again overrule appellants' Points of Error Nos. 3, 4 and 5.

In a grouping of Points of Error Nos. 7 through 14, the appellants complain of various errors in connection with the submission of Special Issue No. 12 and the definition included in that issue. Special Issue No. 12 is:

"Do you find from a preponderance of the evidence that the motion to sell the Freeman Plantation was a motion to sell substantially all of the assets of the TSDAR?

"Answer 'We do' or 'We do not'.

"We do not.

"In connection with the foregoing issue, you are instructed that

"A 'sale of substantially all of the assets' means a sale that results in the TSDAR's

being unable to fulfill all of the purposes for which it was formed and operated." The first assault levelled against Special Issue No. 12 is that the trial court refused to follow the "law of the case". In a previous appeal from a summary judgment, decided adversely to the present appellees, in *Governing Board v. Pannill, supra,* the court wrote, at page 525:

"Article 1396–5.09 requires that a two-thirds vote of all qualified voting members is necessary in order to dispose of all or substantially all of a non-profit corporation's assets. The test to be applied when ascertaining whether all or substantially all assets are about to be sold is not the amount or value of the assets disposed of, but rather the nature of the transaction, that is, is the sale in furtherance of the express object of the corporation." (Citing cases)

Admittedly, the trial court did not follow this ruling. That appeal was not from a full trial on the merits before a jury. At that stage of this lengthy litigation the cause of action was a trespass to try title case. The appellate court immediately recognized that, in determining whether there were any material fact issues in dispute, the intermediate court is required to review the evidence in the light most favorable to the party opposing the motion for summary judgment. *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 562 (1962). The case, obviously, was not fully developed. When this case came on for trial on the merits, the parties were different, the pleadings were different, there had been another cause of action consolidated into the cause of action for the purposes of a jury trial. The doctrine or concept known as the "law of the case" has been defined as that principle of law under which the initial determination of questions of law will be held to govern, control and determine the case throughout its subsequent stages. *Trevino v. Turcotte,* 564 S.W.2d 682, 685 (Tex.1968); *Kropp v. Prather,* 526 S.W.2d 283, 285 (Tex.Civ.App. —Tyler 1975, writ ref'd n.r.e.). The application of this doctrine of the law of the case is flexible and must always be addressed to the discretion of the court and, we think,

determined according to the particular circumstances of the case. *Kempner v. Huddleston,* 90 Tex. 182, 37 S.W. 1066 (1896). Also, it is apparent that the record presented on this third appeal, being an appeal after a full and lengthy trial on the merits with a jury acting as the finder of facts, differs in a very material sense from the prior limited appeal. There is no error in the action of the trial judge in declining to follow the "law of the case", as pronounced by another Court of Civil Appeals on a vastly different record. We overrule Point of Error No. 7.

▮ In Point of Error No. 8, appellants complain of the failure of the trial judge to instruct the jury, in connection with Special Issue No. 12, with the following instruction:

"[Y]ou are instructed that the test to be applied when finding whether substantially all of the assets of the TSDAR are about to be sold, is whether the sale is in furtherance of the express purposes of the society."

The charge of the court was filed February 20, 1981. The final judgment recites that the jury returned its special verdict on February 21, 1981. The appellants' requested instruction to Special Issue No. 12, above, was filed for record August 14, at 9:48 A.M., 1981, by the District Clerk of Marion County, Texas. The August 14, 1981, filing was too late.

TEX.R.CIV.P. 273 states:

"Either party may present to the judge and request such written instructions, special issues, definitions or explanatory instructions, as he desires to be given to the jury; and the judge may give them or a part thereof, or he may refuse to give them, as he may see proper. Such requests shall be prepared and presented to the court and submitted to opposing counsel for examination and objection within a reasonable time after the charge is given to the parties or their attorneys for examination. A request by either party for any instructions, special issues, definitions or explanatory instructions shall be made separate and apart from such party's objections to the court's charge."

The above requested instruction or definition to Special Issue No. 12, which was not given by the trial judge, was not refused by the trial judge or marked "Refused" by him as our record affirmatively shows. Therefore, that part of Rule 273, which reads:

"[O]r he may refuse to give them, as he may see proper."

apparently was not adhered to and followed by the attorneys for the appellants. According to our record, the second and third sentences of Rule 273 were not observed. The attorneys for appellants vigorously and in good faith, we think, argue and take the position that they did obtain refusal of the definition (properly marked) from the trial court. The above definition to Special Issue No. 12 was, thereafter, laid on the judge's bench, but they did not file the same with the District Clerk before the charge was read to the jury. We think this was conceded at oral submission before us. Therefore, we think, on this additional ground, that Point of Error No. 8 was waived. We respectfully suggest to the Supreme Court of Texas, in the exercise of its rule making power, to amend TEX.R.CIV.P. 273 and 276 to make it *abundantly clear* that it is the *duty of the attorney requesting a definition* or instruction to have the affirmative duty and obligation to obtain the judge's written refusal on the issue and to go one step further and see that it is properly filed and bears a proper file mark by the District Clerk, showing that it was considered by the trial court and refused before the charge was closed and before the charge was read to the jury. A concise amendment would make the duties of the trial lawyers, the trial judge and the clerk definite, practical and workable. Finding that Rule 273 and Rule 276, under our record, were not complied with, we think that the requesting party has waived his right to have the action of the trial judge reviewed on appeal.

▮ Plaintiffs' Point of Error No. 9 argues that error was committed in instructing the jury on Special Issue No. 12

that the test of whether a sale is of all, or substantially all, of the assets is a sale that results in the Texas Society being unable to fulfill all of the purposes for which it was formed and operated. We hold that Special Issue No. 12 and its definition were substantially correct. In reviewing the record we find a jury issue and a fact issue were properly raised for the jury's determination. Again appellants bring forward the argument that Special Issue No. 12 is contrary to the law of the case as determined by another then Court of Civil Appeals. We have reviewed this question and doctrine of "the law of the case" and we disagree with appellants' position on this doctrine of "the law of the case". In view of the vastly different posture of the trial on the merits in Marion County with different pleadings and parties, we hold that an appeal from the granting of a motion for summary judgment does not, under our record, establish the "law of the case" after new parties are brought in, after parties are dropped, after the pleadings are amended, after a consolidation takes place of two previously separate lawsuits and after all the desired evidence from both parties is brought forward for the consideration of the trial jury. Cogently and compellingly, TEX.R.CIV.P. 274 also requires that:

> "A party objecting to a charge must point out distinctly the matter to which he objects and the grounds of his objection...."

If a specific, pointed, distinct objection is not so brought to the attention of the trial court, it is considered waived upon the appeal of the case. See *Davis v. Campbell*, 572 S.W.2d 660, 663 (Tex.1978); *Vela v. Alice Specialty Co.*, 607 S.W.2d 289, 291 (Tex.Civ.App.—Tyler 1980, no writ); *Crutcher-Rolfs-Cummings v. Ballard*, 540 S.W.2d 380, 388–389 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.) cert. denied, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); also see and compare, generally, *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 924 (Tex.1981); *Bailey v. Merrill*, 582 S.W.2d 489, 490 (Tex.Civ.App.—Beaumont 1979, writ ref'd n.r.e.) Realistically, under our record, the sole objection to the instruc-

tion or definition given was that it constituted "a comment" on the issue. Hence, this cannot provide a reviewable point of error on appeal. *Estate of Blardone v. McConnico*, 604 S.W.2d 278 (Tex.Civ.App.—Corpus Christi), writ ref'd n.r.e., 608 S.W.2d 618 (Tex.1980); *Bottinelli v. Robinson*, 594 S.W.2d 112 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ); *Doherty v. San Augustine Independent School Dist.*, 178 S.W.2d 866 (Tex.Civ.App.—Amarillo 1944, writ ref'd w.o.m.). See also *Petroleum Anchor Equipment, Inc. v. Tyra*, 410 S.W.2d 238, 243–244 (Tex.Civ.App.—Dallas 1966), rev'd on other grounds, 419 S.W.2d 829 (Tex.1967); *Banker v. McLaughlin*, 200 S.W.2d 699, 703 (Tex.Civ.App.—Beaumont 1947), aff'd 146 Tex. 434, 208 S.W.2d 843 (1948).

■ A special meeting of the Texas Society DAR was held in August, 1972, as a result of the purchase of the plantation. In order to support and maintain the Freeman Plantation, several special funds of the society were terminated. One was a fund designed "To cherish, maintain and extend the institutions of American freedom, to foster true patriotism and love of country, and to aid in securing for mankind all the blessings of liberty" by providing certain scholarships to qualifying and worthy young scholastics within Texas. Perhaps of paramount importance was the position taken by some delegates at the 1975 State Conference to dispose of the Freeman Plantation because it was interfering and defeating, or partially defeating, three primary objectives of the society: (1) "[T]o foster a closer relationship among the Chapters of Texas;" (2) "[T]o strengthen and extend the influence of the Daughters of the American Revolution, throughout the State; ...." (3) "To perpetuate the memory and spirit of the men and women who achieved American Independence, ... by the encouragements of historical research in relation to the American Revolution and the publication of its results;" [and] "[B]y the preservation of documents and relics, and of the records of the individual services of the Revolutionary soldiers and patriots, ...." through the

publication of a four volume "A Roster of Texas Daughters' Revolutionary Ancestors". Therefore, in view of this record, the jury could have reasonably concluded and found that the ownership of the Freeman Plantation was not the only or best means of carrying out the high purposes of the society.

Professor Margaret Amsler, who was proffered and qualified as an expert on non-profit corporation law and who is credited with writing the Non-Profit Corporation Act, testified that article 1396–5.09 was not applicable to the motion to sell the Freeman Plantation. It is elementary that the jury had a right to weigh and consider this expert's opinion evidence.

The Freeman Plantation was one of several significant assets. Various stocks, bonds and certificates of deposit valued at well over Ninety-three Thousand and No/100 ($93,000.00) Dollars were then owned by the society. Nor did the questioned sale include the DAR Museum at Texas Women's University in Denton, or the Texas Room in the National DAR Headquarters at Washington, or the valuable, prized one hundred fifty (150) acres of excellent timberland in Jasper County—the DAR State Forest. The jury could have judiciously concluded that the sale of the Freeman Plantation involved the sale of no more than one-quarter to one-third of the total assets of the society and did not constitute a sale of substantially all of the society's assets.

Moreover, we think that the appellants waived any appealable objection or exceptions to the trial court's charge for failing to instruct the jury as follows:

> "In connection with the above issue, [Special Issue No. 12] you are instructed that the test to be applied when finding whether substantially all of the assets of TSDAR are about to be sold is whether the sale is in furtherance of the express purposes of the Society."

Apparently, such instruction was not requested in writing separately and timely tendered for a ruling thereon by the trial court. TEX.R.CIV.P. 273. Point of Error No. 9 is overruled.

Following the appropriate guidelines, rules, standards and criteria set out in the landmark cases, governing precedents and authorities (such as *Garza v. Alviar, supra,* and *In re King's Estate, supra*) and the definitive Law Review articles, concerning the no evidence points, the insufficiency of evidence points, as well as points involving the overwhelming weight and preponderance of the evidence test, we, under this record, are constrained to overrule appellants' Points of Error Nos. 10, 11 and 12, as well as Points of Error Nos. 13 and 14. If we understand Point of Error No. 13 correctly, under our record, it was possible rather than impossible for the jury to return an affirmative answer to Special Issue No. 12 and, therefore, the trial court did not commit error in submitting Special Issue No. 12.

Concerning Points of Error Nos. 13 and 14, with procedural irregularities aside, appellants vigorously argue and cite, and rely upon, the case of *Moser Co. v. First Church of Christ, Scientist,* 525 S.W.2d 946 (Tex. Civ.App.—Waco 1975, no writ). We distinguish *The Moser Co. Case, supra,* because, there, a real estate broker was seeking to collect a commission under a contract to sell the church property, including the church and sanctuary, where, without dispute, the sale of the entire church building and facility and sanctuary would unquestionably leave the worshipers without any place to conduct church services or worship services. This was a local congregation, located in one city (located in the City of Dallas) and it was obvious that the Dallas congregation needed a Dallas church building and sanctuary to worship in. Obviously, in *The Moser Co. Case, supra,* the necessary requisite two-thirds (⅔rds) majority would be the standard and any vote that would not meet the requisite two-thirds (⅔rds) would be in violation of article 1396–5.09.A. In the instant case, we have a statewide organization that had a plurality of express purposes and objects of their society and, in fact, had a historical house and prior headquarters in Austin, Travis County, Texas,

many miles removed from Jefferson, Marion County, Texas. Appellants also rely on *Argue v. Golfcrest Country Club,* 461 S.W.2d 248 (Tex.Civ.App.—Houston [1st Dist.] 1970, no writ). In that case, the shareholders voted to sell the property in Houston in order to acquire property elsewhere, where it would continue its operation as a country club and there the motion to sell was approved by two-thirds (⅔rds) of the vote of the shareholders in compliance with article 1396.5.09. A. We think that *The Moser Co. Case, supra,* and *The Argue Case, supra,* are different and distinguishable from the case at bar.

In view of the background and history of this litigation, as shown in our record, concerning the conflicts, disputes and disruptive effects that flowed from the management of the Freeman Plantation, we cannot find and hold, as a matter of law, that the sale of the Freeman Plantation was not in the furtherance of the purposes of TSDAR. Under this unique record Point of Error No. 14, in which it was urged that the sale of the Freeman Plantation was not in the furtherance of the express purposes of TSDAR and that, therefore, a two-thirds (⅔rds) majority of the vote entitled to be cast by the members present was necessary for a legal sale, is not correct or sustainable.

■ We find that, under our record, article 1396–2.02. B. does not have application. Article 1396–2.02. B., urged by appellants, provides:

"B. Nothing in this Article grants any authority to officers or directions of a corporation for the exercise of any of the foregoing powers, inconsistent with limitations on any of the same which may be expressly set forth in this Act or in the articles of incorporation or by-laws or in any other laws of this State. Authority of officers and directors to act beyond the scope of the purpose or purposes of a corporation is not granted by any provisions of this Article."

The record does not demonstrate that the sale of the Freeman Plantation was inconsistent with the limitations of any part of article 1396–2.02., or the articles of incorpo-

ration of TSDAR or the bylaws of TSDAR, or of any other laws of the State of Texas. We construe article 1396–5.09. to have application where all, or substantially all, of the property and assets of a corporation are to be sold. We do not agree with appellants' position that if the contemplated sale is not in furtherance of an express stated purpose of the non-profit corporation— here, the TSDAR—that compliance with article 1396–5.09. is absolutely required even though less than all, or less than substantially all, of the property and assets of a corporation are being sold.

The appellants timely requested the following instruction to be given with Special Issue No. 12. The requested, but refused, instruction:

"[Y]ou are instructed that a sale of substantially all of the assets means a sale of assets involving the stated purposes of the corporation and in accordance with the stated purposes in the charter, bylaws and other requirements of law in the said corporation."

We hold that the trial court acted correctly in refusing this requested instruction. The appellants urge that *article 1396–5.09. A. is the sovereign statute that decisively controls the sale of any significant asset unless made for an express purpose of the non-profit corporation.* We disagree. Article 1396–5.09. A. simply does not say that.

Appellants aver that, in substance, a sale of assets not involving and adhering to a stated purpose of a nonprofit corporation is equivalent to a sale per se of substantially all of the assets of the non-profit corporation. In addition to article 1396–5.09. A., appellants cite article 1396–2.02. A. (4), (15), (16) reading as follows:

"A. Subject to the provisions of Sections B and C of this Article, each corporation shall have power:

. . . .

"(4) To purchase, receive, lease, or otherwise acquire, own, hold, improve, use, or otherwise deal in and with, real or personal property, or any interest therein, wherever situated, as the purposes of the

corporation shall require, or as shall be donated to it.

"(15) Whether included in the foregoing or not, to have and exercise all powers necessary or appropriate to effect any or all of the purposes for which the corporation is organized.

"(16) Any religious, charitable, educational, or eleemosynary institution organized under the laws of this State may acquire, own, hold, mortgage, and dispose of and invest its funds in real and personal property for the use and benefit and under the discretion of, and in trust for any convention, conference or association organized under the laws of this State or another state with which it is affiliated, or which elects its board of directors, or which controls it, in furtherance of the purposes of the member institution."

Then appellants cite § B. of said article, in part, as follows:

"Authority of officers and directors to act beyond the scope of the purpose or purposes of a corporation is not granted by any provisions of this Article."

These sections of article 1396–2.02. A. and B. deal with the purchase, receiving or acquiring of real and personal property, the use thereof and the investing of funds therein. But these sections of article 1396–2.02. A. and B. do not govern or control, directly, the sale of real and personal property previously purchased and acquired by a non-profit corporation. Nor do these sections of article 1396–2.02. A. and B. attempt to define the sale of all of the assets or the sale of substantially all of the assets of a non-profit corporation. We reason and hold that there was a fact issue raised by the evidence on the question of the sale of substantially all of the property and assets of this non-profit corporation. The jury decided—as they had a right to do—adversely to the appellants. We find the above requested instruction of appellants to be flawed fatally because of the unambiguous wording of article 1396–5.09. A., 1396.2.-02. A. & B., 1396–2.14.

None of the purposes or objects set out in the bylaws of TSDAR would be permanently terminated by the sale of the Freeman Plantation. Under our record, the sale of the Freeman Plantation did not render the corporation unable to accomplish the purposes and objects for which it was expressly incorporated; indeed, it may have rendered the corporation increasingly able to do so by putting to rest a source, rightly or wrongly, of disharmony, conflict and discord within the society. This sale certainly did not bring about the winding up or termination of activities of the society.

■ Points of Error Nos. 15 through 18 argue that the trial court committed error in entering judgment for defendants based on an affirmative answer to Special Issue No. 45, inquiring whether the sale of the Freeman Plantation was ratified and confirmed by a majority of the votes entitled to be cast by the members present at the 1976 State Conference. We think Point of Error No. 16, based on no evidence; No. 17, based on insufficient evidence; and No. 18, based on an answer against the overwhelming weight and preponderance, have merit and should be sustained. The official proceedings reflect that on a Thursday afternoon, March 18, 1976, a meeting was reconvened at 2:20 P.M. Immediately, Mrs. B.A. Grainger, State Chairman on Credentials, announced she had been unexpectedly called home. She requested an opportunity to give the last report of the Credentials Committee before leaving. After 2:20 P.M., March 18, 1976, Mrs. Grainger reported four hundred thirty-six (436) voting delegates. *This Credentials Committee report was adopted forthwith.* Mrs. A. Art Williams was appointed Chairman of the Credentials Committee for the remainder of the State Conference. Then the recommendations of the Executive Board, Texas Society Daughters of the American Revolution, were read by the Recording Secretary, Mrs. William A. Burgett. Without cessation or recess, the sixth resolution of the Executive Board was read as follows:

"The Executive Board of the Texas Society, Daughters of the American Revolution, recommends that the Texas Society DAR Inc. confirm, approve and ratify

the price of $76,237.50 for which the Freeman Plantation property was sold on April 26, 1975. Mrs. Burgett moved the adoption of the recommendation. Following discussion the State Regent called for a standing vote, pro 213—con 149, and the recommendation was adopted as read."

In view of the Standing Conference Rules for the 1976 State Conference, the delegates and all other members comprising the voting body of the conference were mandatorily required to be present for all business meetings and the delegates were required to be in their seats in the delegate section at the opening of each meeting and remain there until adjournment. The doors were mandatorily required to be closed during each business meeting and "shall be opened at the direction of the Regent. No seating shall take place during the program."

In view of the relevant, governing Conference Standing Rules for the 1976 State Conference, the credentials committee report of four hundred thirty-six (436) voting delegates; the immediate presentation of the resolutions, including the sixth; the fact that the resolution to confirm, approve and ratify the price of Seventy-six Thousand Two Hundred Thirty-seven and 50/100 ($76,237.50) Dollars for the sale of the Freeman Plantation carried by a standing vote of only two hundred thirteen (213) pro; we find that the vote of two hundred thirteen (213) is less than one-half (½), plus one (1), of four hundred thirty-six (436). For a majority vote, it would have taken two hundred nineteen (219) votes—being two hundred eighteen (218) (which is one-half (½) of four hundred thirty-six (436)) plus one (1). There is insufficient evidence that any of the voting delegates had a chance to leave or were not present at 2:20 P.M., March 18, 1976, and, hence, we sustain Points of Error Nos. 15, 16, 17 and 18. Because of the proceedings and formal actions on resolutions at the 1977 State Conference of TSDAR, our sustaining Points of Error Nos. 15, 16, 17 and 18 do not effect a reversal of the judgment.

We overrule appellants' Points of Error Nos. 19, 20, 21 and 22, attacking on the grounds of being erroneous and wrong as a matter of law, "no evidence", "insufficient evidence" and "greater weight and preponderance of the evidence as to be manifestly wrong and unjust", levelled at and assailing Special Issue No. 49. No. 49 was submitted to the jury as follows:

"Do you find from a preponderance of the evidence that the sale of the Freeman Plantation and the personal property therein to the DeWare Defendants was ratified and confirmed by a majority of the votes entitled to be cast by the members present when the voting was conducted at the 1977 TSDAR State Conference?

"Answer 'We do' or 'We do not'.

" We do "

We have previously held, construed and interpreted article 1396–2.12. A. of the Texas Non-Profit Corporation Act. The official printed record of the proceedings of the 1977 general State Conference show the 78th Annual State Conference of the Texas Society, Daughters of the American Revolution, was held at The St. Anthony, San Antonio, Texas, March 22nd through March 24th, 1977. At a business meeting on Thursday morning, March 24, 1977, the Credentials Chairman, Mrs. Joseph C. Impey, reported as of 5:00 P.M., March 23, 1977 (the day before) there were three hundred ninety-eight (398) voting delegates. Immediately after this report on March 24th (*and we stress the fact immediately thereafter*), a standing vote was taken on an amendment to a bylaw. This was an important amendment to the fiscal bylaws because it involved an additional fee or tax to be paid by the voting members and was adopted by three hundred twenty-eight (328) pro and thirty-two (32) con, making a total of three hundred sixty (360) votes. Circumstantially and inferentially (if not directly) this vote tended to show, and the jury, we think, was well within their prerogative to find from the official proceedings before them, that even after the reporting of three hundred ninety-eight (398) voting delegates, *as of the day before*, being March 23, 1977;

nevertheless, there were in the business meeting of Thursday morning, March 24, 1977, *the day after,* only three hundred sixty (360) voting delegates actually present on the floor in their proper places. No one challenged this vote on an amendment to a bylaw taxing additional fees to be paid by the voting members. The society acquiesced in it. Neither the chair nor the parliamentarian, nor anyone on the floor, challenged it.

Thereafter, the morning business of Thursday, March 24, 1977, was recessed at 12:15 P.M. An official club luncheon was then held at a different place; namely, the Pereaux Room of The St. Anthony. The Thursday afternoon, March 24, 1977, business meeting was not called to order until 2:30 P.M. No report was made by the credentials committee. Sometime later, during a lengthy business session in the afternoon, a detailed resolution was adopted ratifying the payment of litigation fees and expenses, some of the elements of which were the payment of legal expenses and fees to date of Six Thousand Four Hundred Thirty-eight and 37/100 ($6,438.37) Dollars in expenses and Forty Thousand Eight Hundred Eighty-eight and 75/100 ($40,888.75) Dollars in attorney's fees. The official record shows that, following a discussion, Mrs. Walter K. Henry, La Villita Chapter, moved the previous question. The motion was adopted by a standing vote of two hundred (200) pro and fifty (50) con. Later, by standing vote, the recommendation of the State Executive Board was passed by one hundred eighty-six (186) pro and one hundred nine (109) con. Since two hundred fifty (250) votes were cast on the moving of the previous question, and two hundred ninety-five (295) votes were cast on the recommendation of the State Executive Board, the jury, we think, could reasonably conclude and infer that the one hundred eighty-six (186) votes constituted a majority of the votes *then present* and entitled to vote. Certainly the motion to pay sizable expenses and fees for legal services was in no way challenged by anybody in the State Conference. The society as a whole, both majority and minority,

acquiesced in it as did the officials. The State Regent acquiesed in it. The State Parliamentarian acquiesced in it. Everybody acquiesced in it. Quite later on, a very lengthy resolution was proffered to the conference. It was a resolution ratifying the acts of the State Executive Board and officers of the State Society, Daughters of the American Revolution, Inc. This resolution was more than moderately long and occupies virtually two (2) full pages of small print in the official record of the State Conference of 1977 and it ratifies, confirms and approves the sale of the Freeman Plantation and the personal property to the De-Wares on April 26, 1975, for a price of Seventy-six Thousand Two Hundred Thirty-seven and 50/100 ($76,237.50) Dollars. The recommendation of the State Executive Board was adopted by a standing vote of one hundred ninety-one (191) for the recommendation and ninety-nine (99) against, making a total of two hundred ninety (290) votes. This business meeting was recessed at 5:30 P.M., March 24, 1977, and this last resolution was adopted in the extreme latter part of the business session. From the whole record before us, the jury, we think, could reasonably conclude, infer and circumstantially (but properly) find that the one hundred ninety-one (191) was a majority of the votes entitled to be cast and present. One hundred ninety-one (191) is a majority also of two hundred ninety-five (295) votes, being the highest total vote of the entire afternoon business session.

 Again, the State Regent, the State Parliamentarian, all the voting delegates, majority and minority, and the entire society acquiesced in this vote and this result at the 1977 State Conference. In view of the record before us, we cannot hold that there was no evidence to support Special Issue No. 49 and its answer, or that the evidence was legally non-existent, or that the answer made by the jury was erroneous as a matter of law. We find sufficient evidence to support the affirmative answer to Special Issue No. 49 and that it was not so against the greater weight and overwhelming preponderance of the evidence as to be manifestly

wrong and unjust. We confidently and sanguinely think that much more than a scintilla of probative evidence exists. Special Issue No. 49 and the jury's answer thereto must stand. Since there is evidence that raises itself above a scintilla and is more than a scintilla, we overrule the no evidence point. *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 581 (Tex.1963). Having found sufficient evidence to support the submission of Special Issue No. 49 and the jury's answer to Special Issue No. 49, this affirmative answer is not so against the greater weight and preponderance of the evidence as to be clearly wrong and unjust. The appellants, to successfully argue the greater weight and preponderance point, must demonstrate very lucidly that there was more than a preponderance of the evidence in support of their position. This they have not done. See *El Paso Electric Co. v. Whitenack,* 1 S.W.2d 594, 595 (Tex.Comm'n App.1928, judgmt adopted). An intermediate appellate court is not to reverse a judgment based on a jury verdict because, *in its opinion,* the preponderance of the evidence might well be the other way. This is true because that would put the intermediate appellate court in a position of substituting its own judgment for that of the jury. This usurpation of power by us would deny the parties the right of trial by jury which is constitutionally guaranteed. This we cannot do. See *Blum Milling Co. v. Moore-Seaver Grain Co.,* 277 S.W. 78 (Tex.Comm'n App.1925, judgmt adopted). *In re King's Estate,* supra; Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 TEXAS L.REV. 361 (1960); Garwood, "The Question of Insufficient Evidence on Appeal", 30 TEXAS L.REV. 803 (1952). The jury had sufficient evidence of probative force and quality to support its "we do" answer to Special Issue No. 49 which affirmed the approval, ratification, adoption and confirmation of the sale of the Freeman Plantation and the personal property pertinent thereto, to the DeWares, by the action of the society taken at the 1977 State Conference.

By the next four (4) Points of Error Nos. 23, 24, 25 and 26, the appellants challenge and aver reversible error because of the action of the trial court in refusing to grant their motion for change of venue. The appellants proceeded under TEX.R. CIV.P. 257 alleging that there existed in Marion County "a combination against the Plaintiffs' [sic] instigated by influential persons by reason of which the Plaintiffs cannot expect a fair trial". The appellants filed with their motion the affidavits of Thomas E. McCoy, Minnette Carpenter and A.G. Whatley. The appellees filed a response to which they attached affidavits, one of which, by Jesse M. DeWare, IV, questioned the credibility of Mrs. Minnette Carpenter. Jesse M. DeWare's affidavit can fairly be construed to question the truthfulness and the facts set out in Mrs. Carpenter's affidavit. A second (2nd) affidavit, of A.G. Whatley, stated that his prior affidavit, presented to him by the appellants and bearing his signature, simply was not correct and that, indeed, in Mr. Whatley's opinion, the appellants could receive a fair trial in Marion County and, further, that, as Sheriff of Marion County, he could state that the people of that county were fair-minded people. An affidavit from Thomas E. McCoy, as well as his testimony, pointed out that he did not know what he had signed in the prior, original, affidavit presented to him by the appellants. Thus, the truth of the facts set out in the motion for change of venue were attacked and factual issues were raised. Under TEX.R. CIV.P. 258 "[T]he issue thus formed shall be tried by the judge . . . ." Well reasoned authorities hold that if the contestant to the motion to change venue merely avers "it is not true", then the raised issues must be tried by the judge, pursuant to TEX.R. CIV.P. 258. *City of Irving v. Luttrell,* 351 S.W.2d 941 (Tex.Civ.App.—Amarillo 1961, no writ). The burden was upon the movant to prove the facts upon which the motion for change of venue was based. Rule 258 mandates and requires a hearing before the trial court for the purpose of presenting evidence. In *The City of Irving Case, supra,* the trial judge was reversed because he

acted upon the venue issue without hearing evidence. The affidavits cannot be properly considered as evidence. They serve as pleadings to raise and frame the fact issues. *Galveston, H. & S.A. Ry. Co. v. Nicholson,* 57 S.W. 693 (Tex.Civ.App.1900, writ ref'd). Upon the hearing the trial judge becomes invested with broad discretion to determine whether the change of venue should be granted or refused. It is true that a clear abuse of discretion on the part of the trial judge is reviewable by an appellate court but, unless a clear abuse of discretion is shown, the decision below should not be disturbed on appeal. See *Robertson v. Robertson,* 382 S.W.2d 945 (Tex.Civ.App.—Amarillo 1964, writ ref'd n.r.e.). We think Rule 258 was substantially complied with. No abuse of discretion on the venue motion is shown. Exercising his broad discretionary powers, the trial judge, on the evidence before him, could properly find that the appellants could obtain a fair and impartial trial in Marion County. *City of Abilene v. Downs,* 367 S.W.2d 153 (Tex.1963). Points of Error Nos. 23, 24, 25 and 26 are disallowed.

■ Appellants, in their Points of Error Nos. 27, 28 and 29, attack Special Issue No. 13, inquiring whether or not Freeman Plantation was sold for less than the fair market value. Points of Error Nos. 30, 31 and 32 are levelled against Special Issue No. 15, which inquired whether or not defendant, Pannill, failed to obtain the highest price reasonably possible. The testimony on fair market value ranged from about Forty-five Thousand and No/100 ($45,000.00) Dollars to One Hundred Twenty-five Thousand and No/100 ($125,000.00) Dollars. The jury had a right and duty to weigh this opinion evidence. Expert testimony of values are especially subject to the process of being weighed and determined by the jury. We have examined the record according to the appropriate guidelines, landmark cases, precedents and authorities and overrule appellants' Points of Error Nos. 27, 28, 29, 30, 31 and 32.

Special Issue No. 33 is:

"Do you find from a preponderance of the evidence that Defendants Pannill and Hamel gave preference to the DeWare Defendants in purchasing the Freeman Plantation?

"Answer 'We do' or 'We do not'.

" We do not "

The appellants, in their Points of Error Nos. 33, 34 and 35 attack the jury's negative answer with a no evidence point, an insufficient evidence point and an overwhelming weight and preponderance of the evidence point. Following the proper guidelines, we disallow Points of Error Nos. 33, 34 and 35. Moreover, we hold that Special Issue No. 33 is not an ultimate controlling issue upon which to base a judgment in view of the answers to Special Issue No. 56 and the action taken by the 1977 State Conference.

Special Issue No. 56 is:

"Do you find from a preponderance of the evidence that the following former Defendant officers of the TSDAR acted reasonably, in good faith and within their authority as officers of the TSDAR with respect to the conduct alleged by Plaintiffs?

"Answer 'We do' or 'We do not' as to each of the following Defendants:

"Pannill: We do

"McElroy: We do

"Edman: We do

"Wickett: We do

"You are instructed that in considering whether or not each Defendant acted in good faith, you may take into consideration whether such Defendant sought and reasonably relied in good faith on professional advice with respect to legal matters, real estate values and parliamentary procedure."

Appellants uniformly attack Special Issue No. 56 on the no evidence flank, the insufficient evidence flank and the against the overwhelming weight and preponderance of the evidence flank. Again, under the proper guidelines, the landmark decisions and authorities, we overrule appellants' Points of Error Nos. 36, 37 and 38.

Point of Error No. 39 argues that the trial court, having instructed and directed Dr. DeWare, a witness for the defendants, to treat a medical condition of one of the jurors, committed error in entering judgment for the defendants based upon the verdict of the jury. During the course of the trial and while the jury was in the jury box, the district judge was advised that a juror was having a medical problem. Apparently, the court then directed that such juror, R.W. Player, stand or identify himself. The court instructed Dr. DeWare, who later was a witness, to treat the medical condition of the said juror. The doctor and the juror left the courtroom and after some minutes passed they returned to the courtroom. The exact extent of Dr. DeWare's treatment of the juror is unknown. The court thereupon instructed the appellants' attorney to continue to present his evidence. Although it might have been very difficult strategically for the appellants' attorney to immediately move for a mistrial in open court, he certainly could have approached the bench. He, of course, would have been granted the privilege of approaching the bench and asking, out of the hearing of the jury, for a mistrial. At the bench, he could have requested an immediate hearing in chambers outside the presence and hearing of the jury. His failure to make a timely motion for mistrial, we feel, waived the error if any existed. This was an unfortunate course of action on the part of the trial court. But a medical emergency—a serious nosebleed—had arisen for the juror. The trial judge and the *only doctor present* reacted in a normal, humanitarian manner.

The cases from our jurisdiction relied upon by the appellants, such as *Texas Employers' Insurance Association v. McCaslin,* 159 Tex. 273, 317 S.W.2d 916 (1958); *Texas Milk Products Co. v. Birtcher,* 138 Tex. 178, 157 S.W.2d 633 (1941) and *Texas Employers' Insurance Association v. Brooks,* 414 S.W.2d 945 (Tex.Civ.App.—Beaumont, 1967, no writ) are distinguishable and different. In *The McCaslin Case, supra,* the plaintiff purposely made a visit to contact one of the jurors and concluded the conversation by saying "Be sure and do all you can to help me" or something of a similar nature or wording. In *The Texas Milk Products Co. Case, supra,* one of the jurors, E.B. Braley, went to a cafe directly across the street from the courthouse where he met the plaintiff, Birtcher, and asked Birtcher to have a cold drink with him. Birtcher declined saying that he had already had a cold drink; that he would buy one for the juror, Braley. In *The Brooks Case, supra,* tried in Jefferson County, a member of the jury approached the plaintiff and his spouse and asked if she could ride to Port Arthur with them at the end of the day. The juror was told that she could and the juror did ride with them from the courthouse in Beaumont to Port Arthur. On the second day of the trial the same juror again asked for a ride which was again given by the plaintiff's brother-in-law, with the plaintiff and his wife also being in the automobile with the juror. In these three (3) cases there was no possible jury misconduct involving the trial judge. In *Occidental Life Insurance Co. of Cal. v. Duncan,* 404 S.W.2d 52 (Tex.Civ.App.—San Antonio, 1966, writ ref'd n.r.e.) the record showed that, during the trial and during a recess, a member of the jury was sitting on a bench outside the courtroom directly across the hall from a water fountain when the claimant, Duncan, asked the juror if she had any aspirin. The juror gave two (2) aspirins to Duncan who immediately took same. The court reasoned that reversible error was shown because, by asking for the aspirin and taking the same, claimant, Duncan, was conveying to the juror that he was, indeed, in pain and needed the aspirin to relieve the pain. In *Traders & General Ins. Co. v. Lincecum,* 130 Tex. 220, 107 S.W.2d 585 (Tex.Comm'n App. 1937, opinion adopted), the jury misconduct problem concerned the lump sum issue in a workman's compensation case. Apparently the jury had discussed and considered that the defendant insurance company was the only company writing workmen's compensation insurance in the oil fields and that all the other insurance companies had gone broke and the defendant might go the same

way and, unless the jury awarded Lincecum compensation in a lump sum he might not receive his weekly compensation. There was no proof of these facts in the record. The misconduct took place within the confines of the jury deliberation room. Appellants also argue that the case of *State v. Hunt*, 25 N.J. 514, 138 A.2d 1 (1958) was a similar, controlling case. In that case a juror asked to have a doctor examine a boil on his arm. Dr. O'Connell was called by a court attache or attendant to treat the juror. The doctor explained to the juror that he did not want to discuss the murder case on trial because he might be a witness, but then treated the juror. Later, the doctor was called as a witness for the State in this capital murder case. *There were other doctors available. Hunt was convicted of first degree murder and sentenced to death.* A reading of the reported case reveals several other serious, harmful errors. In the concluding part of its opinion, the New Jersey court wrote, 138 A.2d at page 13:

"However, we need not pursue this issue nor need we determine whether any single one of the trial errors referred to earlier in this opinion would constitute reversible error. We are satisfied that in their aggregate they deprived the defendant of the fair and lawful trial which was his due under our system of criminal justice . . . .

" ' " * * * the rule is that where any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet if all of them taken together justify the conclusion that defendant was not accorded a fair trial, it becomes the duty of this court to reverse. *State v. Briggs*, 84 Minn. 357, 87 N.W. 935; *State v. Almos*, 122 Minn. 479, 142 N.W. 801." ' "

We think *The Case of State v. Hunt, supra,* is not controlling. A motion for mistrial must be made at the earliest time after the events made the basis of the motion. If the rule was otherwise, the movant could await the verdict and then file and urge his motion. This would give the movant an unfair advantage. Point of Error No. 39 is overruled.

■ Points of Error Nos. 40 and 41 complain of the acts of the trial court in permitting one juror to attempt to talk to one attorney for the defense. During the trial, one of the jurors, a Mr. Norman Allen, attempted to contact Welby Parish, who was one of the attorneys for the defense. Mr. Parish properly refused to converse with the juror. All was certainly proper to this point. Mr. Parish could not have prevented the juror from making the attempt to contact and talk with him. The juror then contacted the trial judge and explained that he desired to have this Mr. Parish advise a friend of his on an unrelated matter. The trial judge did permit Mr. Allen to speak briefly with Mr. Parish before the bench and in the presence of the District Clerk after strictly admonishing Mr. Allen not to discuss the lawsuit. While the District Judge and Mrs. Blackburn, the District Clerk, listened, Mr. Allen explained what he desired. Thereafter, again, with all propriety, Mr. Parish properly refused to speak with the juror except to tell him that he could not discuss anything with him until the trial was completed. Mr. Thompson then moved for mistrial, or in the alternative that the juror be removed from the jury as disqualified. The court, out of an abundance of precaution and with agreement of the parties, granted Mr. Thompson's motion to excuse the juror. The trial proceeded with eleven (11) jurors. Viewing the incident and the sequelae involving the juror, Mr. Norman Allen, in its totality, we are not of the opinion that the error complained of amounted to such a denial of the rights of the appellants as to reasonably be calculated to cause and probably did cause, the rendition of an improper judgment in the case. We perceive no harmful reversible error. We find that the trial court did not commit reversible error in denying the appellants' motion for mistrial based on a contact between a juror and counsel for defendants in the presence of the court and the district clerk. Any possible error connected therewith was probably cured by the discharge of the juror and was not such harmful, prejudicial error as would be rea-

**692**

sonably calculated to cause, and did cause, the rendition of an improper verdict in this case. We, therefore, overrule Points of Error Nos. 40 and 41.

From an examination of the official records and proceedings of the State Conferences of 1975, 1976 and 1977, it is shown that every vote taken resulted in at least a majority of the votes cast being in favor, repeatedly, of the sale of the Freeman Plantation House and the personal property pertinent thereto to the DeWares. The minority that has been aligned against the sale of the Freeman Plantation to the DeWares has never prevailed by a majority in any vote taken at any of the State Conferences of 1975, 1976 or 1977. From a fair reading of the record before us, the sale of the Freeman Plantation and the pertinent personal property to the DeWare family has been reaffirmed, ratified, confirmed or approved either by the State Executive Board or by the State Conference three (3) times. At these State Conferences, concerning the crucial votes to sell or to ratify the sale of the Freeman Plantation with its personalty, no formal appeals from the rulings of the Parliamentarian were taken; no formal appeals from the rulings of the State Regent were taken. Indeed, no formal appeals to the floor of these conferences were taken on the grounds that the method of voting or the results of the vote were not in compliance with state law.

We sustain and affirm the first Counterpoint of appellees. Under our opinion, we do not deem it necessary to pass upon appellees' second Counterpoint. We AFFIRM the trial court's judgment, signed March 20, 1981, in its entirety.